# AFFILIATED UTE CITIZENS OF UTAH ET AL. v. UNITED STATES ET AL.

No. 70–78.   Argued October 18, 1971—Decided April 24, 1972

.130

Blackmun, J., delivered the opinion of the Court, in which Burger, C. J., and Brennan, Stewart, White, and Marshall, JJ., joined. Douglas, J., filed an opinion concurring in part and dissenting in part, *post*, p. 157. Powell and Rehnquist, JJ., took no part in the consideration or decision of the case.

*Parker M. Nielson* argued the cause and filed briefs for petitioners.

*A. Raymond Randolph, Jr.,* argued the cause for the United States *pro hac vice.* With him on the brief for the United States and brief for the Securities and Exchange Commission as *amicus curiae* for petitioner Reyos were *Solicitor General Griswold, Assistant Attorney General Kashiwa, Edmund B. Clark, G. Bradford Cook, Walter P. North, Theodore Sonde,* and *Richard S. Seltzer. Marvin J. Bertoch* argued the cause for respondents First Security Bank of Utah, N. A., et al., and filed a brief for First Security Bank of Utah. *Richard Clare Cahoon* filed a brief for respondent Gale. *Hardin A. Whitney* filed a brief for respondent Haslem.

Briefs of *amici curiae* were filed by *John S. Boyden, Stephen G. Boyden,* and *George C. Morris* for the Ute Indian Tribe of the Uintah and Ouray Reservations et al.; by *Arthur Lazarus, Jr.,* and *Milton Eisenberg* for the Association on American Indian Affairs, Inc.; and by *David H. Getches* and *Wallace L. Duncan* for the Native American Rights Fund.

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

These two consolidated cases center in the Ute Indian Supervision Termination Act of August 27, 1954 (hereafter Partition Act), 68 Stat. 868, as amended, 70 Stat. 936 and 76 Stat. 597, 25 U. S. C. §§ 677–677aa; the Securities Exchange Act of 1934, 48 Stat. 881, as amended, §§ 3 (a)(4) and (5), 10 (b) and 15 (c)(1), 15 U. S. C. §§ 78c (a)(4) and (5), 78j (b) and 78*o* (c)(1); the emergence of Affiliated Ute Citizens of the State of Utah (AUC), an unincorporated association, and of Ute Distribution Corp. (UDC), a Utah corporation; and the alleged victimization of Indian shareholders in their sales of UDC shares.

# I
## Background

The Ute Partition Act [1] pertained to the Ute Indian Tribe of the Uintah and Ouray Reservation in Utah. At the time of the Act's adoption the tribe had a membership of about 1,765,[2] consisting of 439 mixed-bloods [3]

---

[1] The Act was one of a series of termination statutes enacted primarily in the years 1954–1956. See, for example, the Menominee Indian Termination Act of June 17, 1954, 68 Stat. 250, 25 U. S. C. § 891 *et seq.;* the Klamath Indian Termination of Supervision Act of Aug. 13, 1954, 68 Stat. 718, 25 U. S. C. § 564 *et seq.;* the Act of Aug. 13, 1954, 68 Stat. 724, 25 U. S. C. § 691 *et seq.* (Western Oregon); the Act of Aug. 23, 1954, 68 Stat. 768, 25 U. S. C. § 721 *et seq.* (Alabama and Coushatta); the Act of Sept. 1, 1954, 68 Stat. 1099, 25 U. S. C. § 741 *et seq.* (Paiute); the Act of Aug. 1, 1956, 70 Stat. 893, 25 U. S. C. § 791 *et seq.* (Wyandotte); the Act of Aug. 2, 1956, 70 Stat. 937, 25 U. S. C. § 821 *et seq.* (Peoria); and the Act of Aug. 3, 1956, 70 Stat. 963, 25 U. S. C. § 841 *et seq.* (Ottawa). Others were the Act of Sept. 21, 1959, 73 Stat. 592, 25 U. S. C. § 931 *et seq.* (Catawba), and the Act of Sept. 5, 1962, 76 Stat. 429, 25 U. S. C. § 971 *et seq.* (Ponca).

The termination policy exemplified by these acts is not without its criticism. See the President's Special Message to the Congress on Indian Affairs, July 8, 1970, Public Papers of the Presidents, Richard Nixon, 1970, pp. 564–576.

[2] S. Rep. No. 1632, 83d Cong., 2d Sess., 5 (1954); H. R. Rep. No. 2493, 83d Cong., 2d Sess., 2 (1954).

[3] Counsel for the petitioners advised us at oral argument that the term "mixed-blood" is a slur and is offensive and that the preferred description is "terminated Utes." Tr. of Oral Arg. 4. Section 2 of the Act, however, defines as a "full-blood" a member of the tribe "who possesses one-half degree of Ute Indian blood and a total of Indian blood in excess of one-half, excepting those who become mixed-bloods by choice . . . ." It defines as a "mixed-blood" a member of the tribe who does not fall within the full-blood class, and one who becomes a mixed-blood by choice. 25 U. S. C. §§ 677a (b) and (c). The provision as to choice is § 4 of the Act, 25 U. S. C. § 677c. Inasmuch as the statute specifically employs the terms "full-blood" and "mixed-blood," we feel compelled, for purposes of consistency and clarity, to do the same. No slur or offense whatsoever is intended.

and 1,326 full-bloods. Section 1 of the Act stated its purpose, namely "to provide for the partition and distribution of the assets of the . . . Tribe . . . between the mixed-blood and full-blood members thereof; for the termination of Federal supervision over the trust, and restricted property, of the mixed-blood members of said tribe; and for a development program for the full-blood members thereof, to assist them in preparing for termination of Federal supervision over their property." 25 U. S. C. § 677. The then-estimated value of the cash, accounts receivable, and land owned by the tribe was $20,702,885.[4] The tribe possessed additional assets consisting of oil, gas, and mineral rights (principally oil shale deposits underlying the reservation), and unadjudicated and unliquidated claims against the United States.

Section 8 of the Act, 25 U. S. C. § 677g, called for the preparation of the rolls of full-blood members and mixed-blood members, and for the finality of those rolls. Section 5, as amended, 25 U. S. C. § 677d, provided that upon the publication of the final rolls "the tribe shall thereafter consist exclusively of full-blood members," and that mixed-blood members "shall have no interest therein except as otherwise provided" in the Act.

Section 10, 25 U. S. C. § 677i, stated that when the final membership rolls had been published, the tribal business committee, representing the full-bloods, and the "authorized representatives" of the mixed-bloods were to "commence a division of the assets of the tribe that are then susceptible to equitable and practicable

---

[4] S. Rep. No. 1632, 83d Cong., 2d Sess., 6 (1954); H. R. Rep. No. 2493, 83d Cong., 2d Sess., 4 (1954). The cash was attributable primarily to the tribe's 60% share of the settlement judgment of $31,000,000 obtained in *Confederated Bands of Ute Indians* v. *United States*, 117 Ct. Cl. 433 (1950). See the Act of Aug. 21, 1951, § 2, 65 Stat. 194, 25 U. S. C. § 672. The remaining 40% was awarded to the Southern Ute Tribe.

distribution." This was to be based "upon the relative number of persons comprising the final membership roll of each group." [5] Upon the adoption of a plan of division, the mixed-bloods were to prepare a further plan for the distribution of their group's assets to the individual members. § 13 of the Act, 25 U. S. C. § 677l. After each mixed-blood had received his distributive share, directly or in whole or in part through the device of a corporation or other entity in which he had an interest, federal restrictions were to be removed except as to any remaining interest in tribal property, that is, the un-adjudicated or unliquidated claims against the United States, gas, oil, and mineral rights, and other tribal assets not susceptible of equitable and practicable distribution. § 16, 25 U. S. C. § 677o. The Secretary of the Interior then was to issue a proclamation "declaring that the Federal trust relationship to such individual is terminated." § 23, 25 U. S. C. § 677v. Those assets, such as the mineral estate, excepted from the division plans, were to be "managed jointly by the Tribal Business Committee and the authorized representatives of the mixed-blood group." § 10, 25 U. S. C. § 677i.

Section 6 of the Act, 25 U. S. C. § 677e, authorized the mixed-bloods to organize, to adopt a constitution and bylaws, and to provide, by that constitution, for the selection of authorized representatives with power "to take any action that is required by [the Act] to be taken by the mixed-blood members as a group."

Pursuant to this grant of power the mixed-bloods, in 1956, organized AUC as an unincorporated association. AUC's constitution, Art. V, § 1 (b), empowered its board

---

[5] The final membership rolls were published April 5, 1956. 21 Fed. Reg. 2208–2220 (1956). The rolls listed 490 mixed-bloods and 1,314 full-bloods, a total of 1,804. The ratio was 27.16186% mixed-bloods and 72.83814% full-bloods.

of directors to delegate to corporations organized in accordance with the Act "such powers and authority as may be necessary or desirable in the accomplishment of the objects and purposes for which said corporations may be so organized."

UDC was incorporated in 1958 with the stated purpose "to manage jointly with the Tribal Business Committee of the full-blood members of the Ute Indian Tribe . . . all unadjudicated or unliquidated claims against the United States, all gas, oil, and mineral rights of every kind, and all other assets not susceptible to equitable and practicable distribution to which the mixed-blood members of the said tribe . . . are now, or may hereafter become entitled . . . and to receive the proceeds therefrom and to distribute the same to the stockholders of this corporation . . . ."

The formation of UDC was part of the plan formulated by the mixed-bloods for the distribution of assets to the individual members of their group. By a resolution adopted by a 42–5 vote at a special meeting at which a quorum was present and voting, AUC approved the articles of UDC. The Secretary also approved them. In January 1959 the AUC directors by a unanimous vote (5–0) irrevocably delegated authority to UDC— and, indeed, to two other Utah corporations of the mixed-bloods, Antelope-Sheep Range Company and Rock Creek Cattle Range Company, see § 13 of the Act, 25 U. S. C. § 677l (3)—to accomplish the purposes for which they were formed. UDC then issued 10 shares of its capital stock in the name of each mixed-blood Ute, a total of 4,900 shares. UDC and First Security Bank of Utah, N. A. (the bank), executed a written agreement dated December 31, 1958, by which the bank became transfer agent for UDC stock. UDC apparently also decided at this time not to deliver the certificates for its

shares to the shareholders but, instead, to deposit them with the bank; the bank was then to issue receipts to the respective shareholders. Counsel advised the bank that this was "because of some rather unfavorable experiences had in the Indian service with the loss of valuable instruments."

UDC's articles provided that if a mixed-blood shareholder determined to sell or dispose of his UDC stock at any time prior to August 27, 1964, that is, within 10 years from the date of the Partition Act, he was first to offer it to members of the tribe, both mixed-blood and full-blood, in a form approved by the Secretary; that no sale of stock prior to that date was valid unless and until that offer was made; and that if the offer was not accepted by any member of the tribe, the sale to a nonmember could then be made but at a price no lower than that offered to the members.[6] The articles further provided that all UDC stock certificates should have stamped thereon a prescribed legend referring to those sale conditions.[7] The certificates so issued bore that legend. In addition, each certificate had on its face, in red lettering, a warning that the certificate did not represent stock in an ordinary business corporation, that its future value or return could not be determined, and that the stock should not be sold or encumbered by its owner,

---

[6] A like right of first refusal with respect to a mixed-blood's disposal of his interest in real estate within 10 years is specified in § 15 of the Act, 25 U. S. C. § 677n.

[7] "Transfer of this certificate at any time prior to August 27, 1964, to a person not a member of the Ute Indian Tribe of the Uintah and Ouray Reservation, Utah, as defined in Public Law 671—83rd Congress, approved August 27, 1954, 68 Stat. 868, shall be invalid unless the certificate of the Superintendent of the Uintah and Ouray Reservation is endorsed thereon showing that a prior and proper offer has been made to members of said tribe in accordance with law and the regulations of the Secretary of the Interior."

but should be retained and preserved for the benefit of the shareholder and his family.[8]

The UDC shareholders were advised of the substance of this warning on several occasions after the stock had been issued. UDC's president testified that many responded by saying that their shares were their business and that they could do as they pleased with them.

In August 1960 the Secretary promulgated regulations setting forth the procedure a mixed-blood should follow before effecting a pre-August 27, 1964, sale of his stock to an outsider. 25 Fed. Reg. 7620; 25 CFR §§ 243.1–243.12 (1962). These prescribed for the sale of the stock essentially the same procedure required under §15 of the Act, 25 U. S. C. § 677n, for a mixed-blood's disposal of his interest in real property. 25 CFR § 243.12 (1962). The seller first notified the superintendent of the reservation of the price and terms on which his offer was made. 25 CFR § 243.5 (1962). The superintendent then notified UDC and the business committee of the tribe and posted notices about the reservation. 25 CFR § 243.6 (1962). If no member accepted the offer, the superintendent so informed the offeror, who was then free to sell "at any time within six months thereafter to any person at the same or greater price and upon the same terms and conditions

---

[8] "WARNING

"This certificate does not represent stock in an ordinary business corporation. This corporation is organized for the purpose of distributing to the stockholders in the future their respective shares in the proceeds or income from all claims and assets in which the mixed-blood members of the Utah Indian Tribe of the Uintah and Ouray Reservation, Utah have or will have an interest under the provisions of Public Law 671—83rd Congress, approved August 27, 1954, 68 Stat. 868, as amended. The future value of, or return on, this stock cannot be determined. This stock certificate should neither be sold nor encumbered by the owner thereof, but should be retained and preserved for the benefit of the stockholder and the stockholder's family."

upon which it was offered to the members." 25 CFR § 243.8 (1962). Upon the sale to a nonmember, the seller furnished an affidavit to the superintendent stating the amount he had received. The superintendent prepared a certificate that the stock had first been offered to members and sent the certificate to the bank. The bank attached it to the stock book.

The termination proclamation, contemplated by § 23 of the Act, 25 U. S. C. § 677v, was issued and published by the Secretary effective at midnight August 27, 1961. 26 Fed. Reg. 8042. This, of course, did not purport to terminate the trust status of the undivided assets. Cf. *Menominee Tribe* v. *United States,* 391 U. S. 404 (1968).

## II
### The Present Litigation

A. *The AUC Case.* In April 1968 AUC, on its own behalf and as representative of its 490 mixed-blood members, instituted suit against the United States seeking (1) pro rata distribution to the individual members of the 27.16186% [9] of the mineral estate underlying the reservation, and (2) a determination that AUC and not UDC is entitled to manage that property jointly with the business committee of the full-bloods. Jurisdiction was asserted under 25 U. S. C. § 345 (authorizing an action against the United States for an Indian allotment claim, see n. 11, *infra*), and under 28 U. S. C. §§ 1399 and 2409 (authorizing a partition action where the United States is a tenant in common or a joint tenant).

The United States moved to dismiss the complaint for want of subject matter jurisdiction and for failure to

---

[9] This figure appears to have been misstated as 27.1686% in the complaint. The error was carried forward into the respective opinions of the District Court and of the Court of Appeals. 431 F. 2d 1349, 1350.

state a claim. The District Court granted this motion on both grounds. The Tenth Circuit affirmed. 431 F. 2d 1349 (1970).

B. *The Reyos Case.* In February 1965 Anita R. Reyos and 84 other mixed-bloods sued the bank, two of the bank's employee-officers, John B. Gale and Verl Haslem, and certain automobile dealers,[10] charging violations of the Securities Exchange Act of 1934 and of Rule 10b–5 of the Securities and Exchange Commission. By subsequent amendment to the complaint the United States was added as a party defendant. Jurisdiction was asserted under 28 U. S. C. §§ 1331 and 1346 (b).

The parties selected 12 "bellwether plaintiffs" from among the 85 for purposes of initial trial. These plaintiffs had sold UDC shares to various nonmembers including the defendants Gale and Haslem. The sales took place after the proclamation of termination of the federal trust relationship.

The District Court held the bank and the two officer defendants liable for damages to each of the 12 plaintiffs. It also ruled that the United States possessed, and did not fulfill, a duty to prevent the sales and thus, under the Federal Tort Claims Act, 28 U. S. C. §§ 2671–2680, was liable for damages with respect to sales that had taken place before August 27, 1964. It also ruled, however, that the United States was not liable with respect to sales after that date or to two plaintiffs whom the court found to be contributorily negligent. The court determined that the fair value of the UDC stock at the times of the plaintiffs' sales was $1,500 per share. The damages against the two individuals and the bank were fixed in the aggregate at $129,519.56. Damages against the United States were fixed in the aggregate at

---

[10] The dealers settled and the actions against them have been dismissed.

$77,947.35. Judgment was entered accordingly under Fed. Rule Civ. Proc. 54 (b).

The several defendants appealed and the 12 plaintiffs whose cases were tried cross-appealed. The Tenth Circuit reversed and remanded. 431 F. 2d 1337 (1970).

C. On the petition of AUC and the 12 plaintiffs this Court granted certiorari in both cases because of the importance of the issues for Indians whose federal supervision is in the course of termination. 402 U. S. 905 (1971).

### III

### The AUC Case

The two cases, although different, have their roots in the formation of UDC, and it is not inappropriate that the cases were consolidated and are here together.

A. As hereinabove noted, AUC in its litigation seeks two things: outright distribution of the mixed-bloods' percentage of the mineral estate, and a determination that AUC is entitled to participate in management with the business committee of the full-bloods.

There is, and can be, no dispute that the United States holds title to the land, including the mineral interest, constituting the Uintah and Ouray Reservation. Prior to the 1954 Act all members of the tribe were the beneficial owners of that mineral interest. The division of the interest between the full-bloods, on the one hand, and the mixed-bloods, on the other, came about by reason of the Act and of the procedures set in motion by the Act. To the extent, therefore, that AUC, by its suit, seeks distribution to the individual mixed-bloods whom it purports to represent, it is necessarily a suit against the United States.

The United States, of course, may not be sued without its consent. *United States* v. *Sherwood,* 312 U. S. 584, 586 (1941). This long-established principle has been

applied in actions for the possession or conveyance of
real estate. *Malone* v. *Bowdoin,* 369 U. S. 643 (1962).
It has been applied to Indian lands the title to which
the United States holds in trust. *Minnesota* v. *United
States,* 305 U. S. 382 (1939); *Oregon* v. *Hitchcock,* 202
U. S. 60, 70 (1906). It has been applied, specifically, in
a suit by an Indian who has a beneficial interest in land.
*Naganab* v. *Hitchcock,* 202 U. S. 473 (1906). *Naganab,*
therefore, controls the distribution aspect of the AUC
case unless the United States has consented to be sued.

The consent, it is claimed, exists in 25 U. S. C. § 345.[11]
This, however, is an allotment statute. Allotment is a
term of art in Indian law. U. S. Dept. of the Interior,
Federal Indian Law 774 (1958). It means a selection of
specific land awarded to an individual allottee from a
common holding. *Reynolds* v. *United States,* 174 F.
212 (CA8 1909). See the Act of February 8, 1887, 24
Stat. 388, as amended, 25 U. S. C. §§ 331–334. Section
345 authorizes, and provides governmental consent for,
only actions for allotment. *First Moon* v. *White Tail,*
270 U. S. 243 (1926); *Harkins* v. *United States,* 375
F. 2d 239 (CA 10 1967); *United States* v. *Preston,* 352
F. 2d 352, 355 (CA9 1965). See *Arenas* v. *United States,*
322 U. S. 419 (1944).

Although the interest in the mineral estate that AUC
seeks to have conveyed pro rata to the individual mixed-

---

[11] Title 25 U. S. C. § 345 reads:

"All persons who are in whole or in part of Indian blood or descent
who are entitled to an allotment of land . . . or who claim to have
been unlawfully denied or excluded from any allotment . . . may
commence and prosecute . . . any action . . . in relation to their
right thereto in the proper district court of the United States; and
said district courts are given jurisdiction to try and determine any
action . . . involving the right of any person, in whole or in part
of Indian blood or descent, to any allotment of land under any law
or treaty (and in said suit the parties thereto shall be the claimant
as plaintiff and the United States as party defendant) . . . ."

bloods perhaps could be made the subject of an allotment, it has never been so subjected. Neither is it appurtenant to an allotment. The interest relates to the tribal land of the reservation. It remains tribal property. Further, § 10 of the 1954 Act, 25 U. S. C. § 677i, itself contemplates and provides specifically for the nonallocation of that interest.

We therefore readily conclude that § 345 has no application here. Neither do 28 U. S. C. §§ 1399 and 2409 afford a basis for jurisdiction; they have application only to partition suits where the United States is a tenant in common or a joint tenant. That is not this situation.

The AUC action, therefore, was properly dismissed for want of jurisdiction.

B. AUC's prayer for a determination as to management rights deserves a further word.

The Ute Partition Act was the result of proposals initiated by the tribe itself. See H. R. Rep. No. 2493, 83d Cong., 2d Sess., 2 (1954); S. Rep. No. 1632, 83d Cong., 2d Sess., 7 (1954). The tribe also drafted the Act. *Id.*, at 3 and 7, respectively. It provided for organization by the mixed-bloods and "for the selection of authorized representatives" with power to take any action the Act required to be taken by the mixed-bloods as a group. § 6, 25 U. S. C. § 677e. AUC was formed in 1956 and was the product of this organizational power. Its constitution and bylaws authorize the delegation of necessary or desirable power or authority to corporations formed by the mixed-bloods. UDC was formed by mixed-bloods in 1958 specifically to manage mineral rights and unadjudicated claims against the United States jointly with the business committee. AUC approved UDC's articles and by resolution delegated authority to UDC to act in accord with those articles.

These steps were taken pursuant to the Partition Act.

UDC's formation and structure were contemplated by the Act, and AUC itself created and breathed life and vigor into UDC. All this was within Congress' power. *United States* v. *Waller*, 243 U. S. 452, 462 (1917); *Tiger* v. *Western Investment Co.*, 221 U. S. 286 (1911). UDC's legitimacy was further recognized by its anticipatory exemption from federal income tax, under the Act of August 2, 1956, § 3, 70 Stat. 936; by the freeing of its shares from mortgage, levy, attachment, and the like, so long as the shares remained in the ownership of the original shareholder or his heirs or legatees, under the Act of September 25, 1962, 76 Stat. 597, 598; and by the inclusion of UDC by name as an entity to receive the trust fund resulting from the judgment against the United States in favor of the Confederated Bands of Ute Indians, under the Act of August 1, 1967, 81 Stat. 164, as amended, 82 Stat. 171, 25 U. S. C. § 676a.

Clearly, it is UDC and not AUC that is entitled to manage the oil, gas, and mineral rights with the committee of the full-bloods.

## IV

### The Reyos Case

In this case the 85 plaintiffs sought damages for alleged violations by the defendants, in connection with sales by the plaintiffs of their UDC shares, of § 10 (b) of the Securities Exchange Act of 1934, 15 U. S. C. § 78j (b),[12]

---

[12] "SEC. 10. It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

"(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the

and of Rule 10b–5 [13] promulgated thereunder by the Securities and Exchange Commission, 17 CFR § 240.10b–5. The sales in question were effected in 1963 and 1964; some were made before, and some were made after, the expiration of the Secretary's specified 10-year period following the passage of the Ute Partition Act.

The claims center in the facts that the bank, by its agreement with UDC, was the transfer agent for UDC shares; that it had physical possession of all the stock certificates with their specific legend of caution and warning; that, because of the bank's possession, a shareholder's possible contact with, and awareness of, the legend was minimized; that the bank handled the documents implementing the first-refusal procedure; and that the mixed-blood who contemplated the sale of his shares was compelled to deal through the bank.

The District Court made lengthy and meticulously detailed findings of fact. Some are not challenged by any of the parties. Others are challenged. The following, we conclude, are adequately supported by the record:

1. In 1959, after the bank was retained as transfer agent, UDC's attorney wrote the bank advising it that UDC's directors, by formal minute, had instructed him

Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

[13] Rule 10b–5, 17 CFR § 240.10b–5:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

"(a) To employ any device, scheme, or artifice to defraud, ·

"(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

to ask the bank "to discourage the sale of stock of the Ute Distribution Corporation by any of its stockholders and to emphasize and stress to the said stockholders the importance of retaining said stock." The letter further stated, "[W]e trust you will impress upon anyone desiring to make a transfer that there is no possible way of determining the true value of this stock."

2. The bank maintained a branch office in Roosevelt, Utah. Many mixed-bloods resided in that area. This was, "among other things for the purpose of facilitating and assisting mixed-bloods in the transfer" of the UDC stock. Defendants Gale and Haslem were the bank's assistant managers at Roosevelt. They were also notaries public.

3. With respect to most of the sales of UDC stock by the 12 plaintiffs to nonmembers of the tribe, either Gale or Haslem prepared and notarized the necessary transfer papers, including signature guarantees and the affidavits of the sellers to the effect that they were receiving not less than the price at which the shares had been offered to members of the tribe. The procedure with respect to the preparation and execution of these affidavits was informal at best. In at least one case the affidavit was signed in blank; in another Gale dissuaded the seller from reading the affidavit before she signed it.

4. Some of the affidavits do not accurately describe the sales to which they relate. Although they state that the sales were for cash, some sellers actually received second-hand automobiles or other tangible property. The superintendent relied on the recitals in the affidavits in preparing his authenticating certificates that were transmitted to the bank as transfer agent.

5. During 1963 and 1964 mixed-bloods sold 1,387 shares of UDC stock. All were sold to nonmembers of the tribe. Haslem purchased 50 of these himself (all after August 27, 1964), and Gale purchased 63 (44

before that date and 19 after). The 113 shares Haslem and Gale purchased constituted 8⅓% of the total sold by mixed-bloods during those two years. The 12 plaintiffs sold 120 shares; of these Gale purchased 10 and Haslem purchased six.[14] They paid cash for the shares they purchased. Thirty-two other white men bought shares from mixed-bloods during the period.

6. In 1964 and 1965 UDC stock was sold by mixed-bloods at prices ranging from $300 to $700 per share. Shares were being transferred between whites, however, at prices from $500 to $700 per share.

7. Gale and Haslem possessed standing orders from non-Indian buyers. About seven of these were from outside the State. Some of the prospective purchasers maintained deposits at the bank for the purpose of ready consummation of any transaction.

8. The two men received various commissions and gratuities for their services in facilitating the transfer of UDC stock from mixed-bloods to non-Indians. Gale supplied some funds as sales advances to the mixed-blood sellers. He and Haslem solicited contracts for open purchases of UDC stock and did so on bank premises and during business hours.

9. In connection with all this, the bank sought individual accounts from the tribal members.

---

[14] On or about July 8, 1964, Gale bought five shares from Glen Reed at $350 per share. He sold them in August for $530 per share. After August 27, 1964, in three separate transactions, he purchased five shares from Letha Harris Wopsock. He sold three of these at a higher price; the record is silent as to whether he sold the other two at a price in excess of his cost. On or about August 31, 1964, Haslem bought five shares from Reed at $400 and resold them immediately. In November 1964 he purchased one share from Joseph Arthur Workman for $350. He transferred the Workman share to his brother. The record does not indicate Haslem's transfer prices.

10. The United States mails and other instrumentalities of interstate commerce were employed by the bank and by Gale and Haslem in connection with the transfer of the UDC shares.

The District Court concluded:

1. As to the United States: The Government had reason to know that the mixed-bloods were selling UDC shares to non-Indians under circumstances of a doubtful nature. It owed a duty to the mixed-bloods to discourage and prevent those sales. Its failure to perform that duty was the proximate cause of the sales.

2. As to Gale and Haslem: The two men had devised a plan or scheme to acquire, for themselves and others, shares in UDC from mixed-bloods. In violation of their duty to make a fair disclosure, they succeeded in acquiring shares from mixed-bloods for less than fair value.

3. As to the bank: It was put upon notice of the improper activities of its employees, Gale and Haslem, knowingly created the apparent authority on their part, and was responsible for their conduct. Its liability was joint and several with that of Gale and Haslem.

The District Court then ruled that each of the defendants, that is, the United States, the bank, Gale, and Haslem, was liable to each of the 12 plaintiffs (32 transactions involving 122 shares), except that the Government was not liable with respect to any sale after August 27, 1964, or with respect to sales made by plaintiffs Workman and Oran F. Curry because of their knowledge and contributory negligence. Using a $1,500-per-share value for UDC stock, as of the times of the sales, the above-described judgments for $129,519.56 and $77,947.35 were computed and entered.

The Court of Appeals reversed in substantial part. It held:

1. As to the United States: There was no duty on the part of the Government to the petitioners, in connection

with their sales of UDC stock, that continued after the 1961 termination. No form of wardship or of federal trust relationship existed with respect to the shares after that date. Thus, damages under the Tort Claims Act were not to be awarded. 431 F. 2d, at 1340–1343.

2. As to Gale and Haslem: They were liable only in those instances where the employee personally purchased shares for his own account or for resale to an undisclosed principal at a higher price. With respect to the other transactions, the two employees performed essentially ministerial functions related to share transfers and their conduct was not sufficient to incur liability. The court remanded the case on the issue of damages, 431 F. 2d, at 1345–1349.

3. As to the bank: There was no violation of any duty it may have had to plaintiffs by its contract with UDC. This was so despite the facts that Gale and Haslem were active in encouraging a market for the UDC stock and that the bank may have had some indirect benefit by way of increased deposits. 431 F. 2d, at 1343–1345. The bank, however, was liable to the extent Gale and Haslem were liable. 431 F. 2d, at 1346–1347.

In summary, then, the Court of Appeals decided the *Reyos* case in favor of the United States and, in large part, in favor of the bank; held Gale and Haslem personally liable, and the bank also, only with respect to a few sales; and, as to those sales, remanded the case on the issue of damages.

We consider, in turn, the posture of the several defendants.

A. *The United States.* The proclamation of August 26, 1961, was contemplated by § 23 of the Act, 25 U. S. C. § 677v. To the extent the nature of the property so permitted, this marked the fulfillment of the purpose set forth in § 1 of the Act, 25 U. S. C. § 677, namely, the termination of federal supervision over the trust and

restricted property of the mixed-bloods. It stated specifically that the mixed-blood thereupon "shall not be entitled to any of the services performed for Indians because of his status as an Indian." This broad reference obviously included the shares of UDC although the undivided interests in turn held by UDC and shared with the full-bloods remained subject to restrictions after the proclamation. § 16 (a), 25 U. S. C. § 677o (a). The UDC stock itself, however, was free of restriction; as to it, federal termination was complete. Each mixed-blood could sell his shares as he wished and to whom he pleased, subject thereafter only to the restrictions imposed by UDC's own articles. There was no remaining governmental authority over those shares. And without such authority there can be no liability on the part of the United States for failure to restrain a sale.

The petitioners' argument that the right of first refusal created a duty on the part of the Government does not persuade us. This first-refusal right with respect to UDC stock is provided for in the corporation's articles and thus was created by UDC itself. The corporation's action in this respect imposed no duty on the United States. To be sure, the first-refusal right was undoubtedly patterned after the first refusal provided for a period with respect to real estate in § 15 of the Act, 25 U. S. C. § 677n, and the Secretary's regulations were made applicable to the first-refusal right in stock "as far as practicable." 25 CFR § 243.12 (1962). But this parallel created no obligation.

B. *Gale and Haslem.* Section 10 of the Securities Exchange Act of 1934, 15 U. S. C. § 78j, makes it unlawful "for any person, directly or indirectly," to "employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention" of any rule "the Commission may prescribe as necessary or appropriate in the public interest

or for the protection of investors." One such rule so prescribed is Rule 10b–5. This declares that, in connection with the purchase or sale of any security, it shall be "unlawful for any person, directly or indirectly," (1) "To employ any device, scheme, or artifice to defraud," (2) "To make any untrue statement of a material fact" or to omit to state a material fact so that the statements made "in the light of the circumstances," are misleading, and (3) "To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."

These proscriptions, by statute and rule, are broad and, by repeated use of the word "any," are obviously meant to be inclusive. The Court has said that the 1934 Act and its companion legislative enactments [15] embrace a "fundamental purpose . . . to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry." *SEC* v. *Capital Gains Research Bureau*, 375 U. S. 180, 186 (1963). In the case just cited the Court noted that Congress intended securities legislation enacted for the purpose of avoiding frauds to be construed "not technically and restrictively, but flexibly to effectuate its remedial purposes." *Id.*, at 195. This was recently said once again in *Superintendent of Insurance* v. *Bankers Life & Casualty Co.*, 404 U. S. 6, 12 (1971).

In the light of the congressional philosophy and purpose, so clearly emphasized by the Court, we conclude that the Court of Appeals viewed too narrowly the activities of defendants Gale and Haslem. We would

---

[15] The Securities Act of 1933, 48 Stat. 74, as amended, 15 U. S. C. § 77a *et seq.;* the Public Utility Holding Company Act of 1935, 49 Stat. 838, as amended, 15 U. S. C. § 79 *et seq.;* the Trust Indenture Act of 1939, 53 Stat. 1149, as amended, 15 U. S. C. § 77aaa *et seq.;* and the Investment Company Act of 1940, 54 Stat. 789, as amended, 15 U. S. C. § 80a–1 *et seq.*

agree that if the two men and the employer bank had functioned merely as a transfer agent, there would have been no duty of disclosure here. But, as the Court of Appeals itself observed, the record shows that Gale and Haslem "were active in encouraging a market for the UDC stock among non-Indians." 431 F. 2d, at 1345. They did this by soliciting and accepting standing orders from non-Indians. They and the bank, as a result, received increased deposits because of the development of this market. The two men also received commissions and gratuities from the expectant non-Indian buyers. The men, and hence the bank, as the Court found, were "entirely familiar with the prevailing market for the shares at all material times." 431 F. 2d, at 1347. The bank itself had acknowledged, by letter to AUC in January 1958, that "it would be our duty to see that these transfers were properly made" and that, with respect to the sale of shares, "the bank would be acting for the individual stockholders." The mixed-blood sellers "considered these defendants to be familiar with the market for the shares of stock and relied upon them when they desired to sell their shares." 431 F. 2d, at 1347.

Clearly, the Court of Appeals was right to the extent that it held that the two employees had violated Rule 10b–5; in the instances specified in that holding the record reveals a misstatement of a material fact, within the proscription of Rule 10b–5 (2), namely, that the prevailing market price of the UDC shares was the figure at which their purchases were made.

We conclude, however, that the Court of Appeals erred when it held that there was no violation of the Rule unless the record disclosed evidence of reliance on material fact misrepresentations by Gale and Haslem. 431 F. 2d, at 1348. We do not read Rule 10b–5 so restrictively. To be sure, the second subparagraph of the rule

specifies the making of an untrue statement of a material fact and the omission to state a material fact. The first and third subparagraphs are not so restricted. These defendants' activities, outlined above, disclose, within the very language of one or the other of those subparagraphs, a "course of business" or a "device, scheme, or artifice" that operated as a fraud upon the Indian sellers. *Superintendent of Insurance* v. *Bankers Life & Casualty Co., supra.* This is so because the defendants devised a plan and induced the mixed-blood holders of UDC stock to dispose of their shares without disclosing to them material facts that reasonably could have been expected to influence their decisions to sell. The individual defendants, in a distinct sense, were market makers, not only for their personal purchases constituting $8\frac{1}{3}\%$ of the sales, but for the other sales their activities produced. This being so, they possessed the affirmative duty under the Rule to disclose this fact to the mixed-blood sellers. See *Chasins* v. *Smith, Barney & Co.,* 438 F. 2d 1167 (CA2 1970). It is no answer to urge that, as to some of the petitioners, these defendants may have made no positive representation or recommendation. The defendants may not stand mute while they facilitate the mixed-bloods' sales to those seeking to profit in the non-Indian market the defendants had developed and encouraged and with which they were fully familiar. The sellers had the right to know that the defendants were in a position to gain financially from their sales and that their shares were selling for a higher price in that market. Cf., in contrast, § 18 (a) of the Act, 15 U. S. C. § 78r (a), and § 11 (a) of the Securities Act of 1933, 15 U. S. C. § 77k (a).

Under the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a

reasonable investor might have considered them important in the making of this decision. See *Mills* v. *Electric Auto-Lite Co.*, 396 U. S. 375, 384 (1970); *SEC* v. *Texas Gulf Sulphur Co.*, 401 F. 2d 833, 849 (CA2 1968), cert. denied *sub nom. Coates* v. *SEC*, 394 U. S. 976 (1969); 6 L. Loss, Securities Regulation 3876–3880 (1969 Supp. to 2d ed. of Vol. 3); A. Bromberg, Securities Law, Fraud—SEC Rule 10b–5, §§ 2.6 and 8.6 (1967). This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact. *Chasins* v. *Smith, Barney & Co.*, 438 F. 2d, at 1172.

Gale and Haslem engaged in more than ministerial functions. Their acts were clearly within the reach of Rule 10b–5. And they were acts performed when they were obligated to act on behalf of the mixed-blood sellers.[16]

C. *The Bank.* The liability of the bank, of course, is coextensive with that of Gale and Haslem.

## V

## Damages

A. The District Court determined that the measure of damages for each seller was the difference between the fair value of the UDC shares at the time of his sale and the fair value of what the seller received, including any amount paid to him in settlement by the automobile dealers. The Court of Appeals held that the measure was "the profit made by the defendant on resale" or, if no resale was made or if the resale was not at arm's length, was "the prevailing market price at the time of the purchase from the plaintiffs." 431 F. 2d, at 1348–1349.

---

[16] Liability here, of course, is not predicated on any broker or dealer concept under § 15 (c)(1) of the Act, 15 U. S. C. § 78*o* (c)(1). A bank is excluded from the respective definitions of those terms in §§ 3 (a)(4) and (5), 15 U. S. C. §§ 78c (a)(4) and (5).

In our view, the correct measure of damages under § 28 of the Act, 15 U. S. C. § 78bb (a), is the difference between the fair value of all that the mixed-blood seller received and the fair value of what he would have received had there been no fraudulent conduct, see *Myzel* v. *Fields,* 386 F. 2d 718, 748 (CA8 1967), cert. denied, 390 U. S. 951 (1968), except for the situation where the defendant received more than the seller's actual loss. In the latter case damages are the amount of the defendant's profit. See *Janigan* v. *Taylor,* 344 F. 2d 781, 786 (CA1 1965), cert. denied, 382 U. S. 879 (1965).

B. The District Court, as has been noted, arrived at a value for the UDC stock of $1,500 per share. The Court of Appeals concluded that this valuation was not substantiated by the record. The petitioners argue for a value in the neighborhood of $28,000 per share, a figure concededly dependent in large part on an estimate of the ultimate worth of oil shale.

We agree with both the District Court and the Court of Appeals that the $28,000 figure is unrealistic and speculative. On the other hand, reasonable inferences may be drawn and the District Court, as the trier of fact on this record, is not restricted to actual sale prices in a market so isolated and so thin as this one. See generally *Bigelow* v. *RKO Radio Pictures, Inc.,* 327 U. S. 251, 264 (1946); *Harry Alter Co.* v. *Chrysler Corp.,* 285 F. 2d 903, 907 (CA7 1960); *O'Malley* v. *Ames,* 197 F. 2d 256 (CA8 1952).

In arriving at the $1,500 figure the District Court considered the existence of extensive oil shale deposits on the reservation; the possession by those deposits of substantial present value and of great potential value; the presence of gas, coal, and other minerals; the administrative cost deposit retained by the United States with respect to each member of the tribe; each petitioner's remaining interest in the 1965 award by the Indian

Claims Commission; the existence of claims against the United States not yet fully adjudicated; and the specific prices at which UDC shares were sold by mixed-bloods and between white persons. The court noted that prices paid for the shares were somewhat influenced by the improper activities of Gale and Haslem; by the excess of sellers over buyers; by the fact the typical Indian seller was not so well informed about the potential value of the stock as was the typical non-Indian buyer; by the fact that the Indian seller was under heavy economic pressure to sell; by opinion evidence as to worth in excess of $700 per share; and by the fact that some portion of the depressant factors in the market was attributable to the defendants. On the other hand, the court noted that not all the market's depressant factors were so attributable to the defendants and that the tribe itself, despite the opportunity so to do, had declined to purchase UDC shares at prices ranging from $350 to $700.

The court then expressed the belief that the problem was not to determine the ultimate worth of the undivided mineral interest underlying the shares or to be governed solely by the sale prices. It concluded that on the preponderance of the evidence the stock was worth $1,500 per share at the times of the petitioners' respective sales.

In the light of all this, and on balance, we find ourselves in agreement with the District Court, and in disagreement with the Court of Appeals, and we conclude that the District Court's $1,500 valuation has sufficient support in the record.

The judgment of the Court of Appeals in the *AUC* case is affirmed. The judgment of the Court of Appeals in the *Reyos* case is affirmed insofar as it concerns the United States; insofar as it concerns the bank and the individual defendants, that judgment is affirmed in part and is reversed in part, as hereinabove set forth, and the case is remanded for further proceedings. Costs are

allowed the individual petitioners as against the bank and the individual defendants.

*It is so ordered.*

MR. JUSTICE POWELL and MR. JUSTICE REHNQUIST took no part in the consideration or decision of this case.

MR. JUSTICE DOUGLAS, concurring in part and dissenting in part.

I join in the Court's opinion and judgment as to the individual and corporate respondents. I would go further, however, and also hold that the United States has waived its sovereign immunity to petitioners' claims.

Petitioners are an unincorporated association of mixed-blood Utes and individuals of that group. They sought damages, in the District Court, for fraudulent securities transactions, for negligence by agents of the Federal Government, and for the deprivation of statutory rights granted them by Congress. The District Court awarded damages on the first two claims, but dismissed the third for want of jurisdiction and for failure to state a claim. The Court of Appeals reversed the two damage awards and affirmed the dismissal of the third action. 431 F. 2d 1337, 1349 (CA10 1970).

In the Ute Indian Supervision Termination Act of 1954, Congress sought

> "to provide for the partition and distribution of the assets of the Ute Indian Tribe of the Uintah and Ouray Reservation in Utah between the mixed-blood and full-blood members thereof; for the termination of Federal supervision over the trust, and restricted property, of the mixed-blood members of said tribe; and for a development program for the full-blood members thereof, to assist them in preparing for termination of Federal supervision over their property." 25 U. S. C. § 677.

That the various property interests in the reservation were to be treated differently is evidenced by the Committee Reports accompanying this legislation:

"An essential provision of the proposed legislation is the division between the two groups, on the basis of their relative numbers, of all tribal assets, *except oil, gas, and mineral rights, and unadjudicated claims against the United States. These undivided assets will continue to be owned and administered jointly by the two groups.* The responsibility for making this division is on the Indians themselves, but if they fail to agree within 12 months after the rolls are completed, the Secretary of the Interior is authorized to make the division." S. Rep. No. 1632, 83d Cong., 2d Sess., 6 (1954) (emphasis added).

Accord, H. R. Rep. No. 2493, 83d Cong., 2d Sess. (1954).

Involved here is the mineral estate in the Reservation lands. Because these "gas, oil, and mineral rights" were "not susceptible of equitable and practicable distribution" among the individual Indians, they were to be "managed jointly by the Tribal Business Committee [of the full-blood Utes] and the authorized representatives of the mixed-blood group." 25 U. S. C. § 677i. The benefits were to be shared proportionately according to the relative numbers of each group on their final membership rolls. *Ibid.*

Congress set forth an explicit procedure for the selection of the "authorized representatives" of the mixed-blood Utes who, with the Tribal Business Committee, were to have managerial powers over the mineral estate in the reservation. Central to this selection was the requirement for "a majority vote of the adult mixed-blood members of the tribe at a special election authorized and called by the Secretary" of the Interior. 25 U. S. C. § 677e. The petitioner Affiliated Ute Citizens was created under this procedure on April 4, 1956. Two

years later, the Ute Distribution Corp. was formed and there lies the root of the present litigation.

The Ute Distribution Corp. was not chartered according to the guidelines mandated by Congress. Rather than following the requirement for a majority vote of the mixed-blood members, it was created by the five board members of Affiliated Ute. Approval of its articles of incorporation was by a vote of only 42 to 5— far short of the majority of the 490 mixed-blood Utes required by 25 U. S. C. § 677e. After incorporation, 10 shares of stock were issued to each of the mixed-blood Utes. Despite the flaws in Ute Distribution Corp.'s formation, the Bureau of Indian Affairs treated it, and not Affiliated Ute Citizens, as the "authorized representative." Payments for mineral rights were thus made to Ute Distribution which, in turn, passed them on to its shareholders as dividends.

Because the Bureau of Indian Affairs viewed the transfer of mineral interests to Ute Distribution as one to the authorized representative, cf. 25 U. S. C. § 677o (a), the restrictions on the transfer of individual property were removed and the federal trust relationship purportedly was terminated. 25 U. S. C. § 677v; 26 Fed. Reg. 8042. It was upon this basis that the courts below held that the individual mixed-blood Utes and the Affiliated Utes no longer had cognizable interests in the mineral estate of the reservation.

Even if the federal trust relationship was terminated as to individual property interests, it does not follow that the trust relationship was also terminated as to the group interest in the mineral rights. The United States continued to owe significant obligations and duties with regard to these mineral interests. See 25 U. S. C. §§ 677i, 677n, and 677o. See Berger, Indian Mineral Interest— A Potential for Economic Advancement, 10 Ariz. L. Rev. 675 (1968). It was to obtain the enjoyment of the

statutory benefits and to redress their injury that petitioners brought this action against the United States.

The waiver of sovereign immunity for claims relating to land allotments first appeared in an amendment to the Indian Appropriations Act of 1894, 28 Stat. 305, as amended, 25 U. S. C. § 345:

> "All persons who are in whole or in part of Indian blood or descent who are entitled to an allotment of land under any law of Congress . . . or who claim to have been unlawfully denied or excluded from any allotment or any parcel of land to which they claim to be lawfully entitled by virtue of any Act of Congress, may commence and prosecute or defend any action, suit, or proceeding in relation to their right thereto in the proper district court of the United States . . . ."

By a further amendment in 1901, Congress made explicit what had previously been only implicit: that it intended to allow allotment claimants to bring actions against "the United States as party defendant." Act of Feb. 6, 1901, § 1, 31 Stat. 760. See H. R. Rep. No. 1714, 56th Cong., 1st Sess. (1900); S. Rep. No. 2040, 56th Cong., 2d Sess. (1901).

Affiliated Ute Citizens argued that their asserted right to a portion of the mineral estate of the reservation was an "allotment or . . . parcel of land" which they had been unlawfully denied and that they were therefore able to bring this action against the United States under § 345. See, e. g., United States v. Pierce, 235 F. 2d 885 (CA9 1956); Gerard v. United States, 167 F. 2d 951 (CA9 1948). The courts below rejected this view, with the Court of Appeals saying:

> "This section of the statute is obviously intended to provide relief to the Indians entitled to possession of allotments and similar interests. The cases and

statutory law have ascribed to the word 'allotment' a well recognized meaning. The nature of the interest sought to be protected and secured does not resemble that described in the statute." 431 F. 2d, at 1350.

We owe to the Indians a beneficent interpretation of remedial legislation designed to right past wrongs. *United States* v. *Kagama,* 118 U. S. 375, 384–385. The Court of Appeals, however, gave only a limited interpretation to this waiver of sovereign immunity against Indians' claims. The Solicitor General likewise argues for a limited application of this waiver and would apply it only to claims concerning "a tract of land set aside out of a common holding and awarded to an individual allottee." [1]

"But in the Government's dealings with the Indians the rule is exactly the contrary. The construction, instead of being strict, is liberal; doubtful expressions, instead of being resolved in favor of the United States, are to be resolved in favor of a weak and defenseless people, who are wards of the nation, and dependent wholly upon its protection and good faith. This rule of construction has been recognized, without exception, for more than a hundred years . . . ." *Choate* v. *Trapp,* 224 U. S. 665, 675.

See also *Alaska Pacific Fisheries* v. *United States,* 248 U. S. 78, 79; U. S. Dept. of the Interior, Federal Indian Law 565–566 (1958).

---

[1] A similar argument was made in *United States* v. *Pierce,* 235 F. 2d 885, 888 (CA9 1956):

"The United States contends that the jurisdictional prerequisite for any action under [§ 345] . . . is the existence of a specific allotment selection which has been *unlawfully denied* by the Secretary of the Interior . . . ." The court rejected this argument saying that it was "based upon an unreasonable limitation as to the purpose of the statute," *ibid.,* and went on to sustain the Indians' claims to income from the land.

The waiver of sovereign immunity should not be so limited as the Solicitor General and the courts below suggest. The 1894 Act, now codified in 25 U. S. C. § 345, was plainly intended to give Indians a means of enforcing their rights to governmental grants of interests in realty.[2] To be sure, the section was enacted in an era during which these grants usually took the form of individual possessory interests in realty, Gilbert & Taylor, Indian Land Questions, 8 Ariz. L. Rev. 102, 112 (1966); but that should not prevent this remedial section from applying to new forms of interests in mineral rights or to other forms of property.[3]

Nor does the plain language of § 345 suggest a contrary result. It speaks of an "allotment or any parcel of land."[4] Certainly the modern, conventional way of allotting mineral rights is through fractional interests created by contracts or through stock interests in corporations to which those allotments are transferred. If

---

[2] *First Moon* v. *White Tail*, 270 U. S. 243, relied upon by the Solicitor General, is not to the contrary because it dealt with the transfer of property occasioned by an Indian's death. Such transfers were removed from the scope of § 345 and "entrusted to the exclusive cognizance of the Secretary of the Interior by the Act of June 25, 1910, c. 431, 36 Stat. 855 . . . ." 270 U. S., at 244.

[3] In *Scholder* v. *United States*, 428 F. 2d 1123, 1129 (CA9 1970), for example, the court noted "that section [345] is not limited to actions seeking to compel the issuance of an allotment in the first instance. It serves also to protect 'the interests and rights of the Indian in his allotment or patent after he has acquired it.'" The court then held that challenges to liens placed upon Indian lands fell within the jurisdictional scope of § 345. Certainly the divestiture of interests in lands, alleged here, should not be entitled to a lesser degree of protection than the imposition of a lien.

[4] Section 345 also requires that the property interest be one derived "under any law of Congress" or "by virtue of any Act of Congress." *E. g., Naganab* v. *Hitchcock*, 202 U. S. 473; *Oregon* v. *Hitchcock*, 202 U. S. 60. In the present case, the rights asserted are those derived from the Ute Indian Supervision Termination Act of 1954.

Congress has waived sovereign immunity for claims relating to fee interests in realty, it surely could not have intended that formal requirements of the art of conveyancy destroy that waiver of immunity for lesser interests in realty. Particularly is that so where, as here, the lesser interest seems to have been granted through an error by the Bureau of Indian Affairs.

The limited retention of sovereign immunity in the Ute termination act further supports petitioners' claims. Title 25 U. S. C. § 677i provides that the "partition [of tribal assets] shall give rise to no cause of action against the United States." The Committee Reports and the statute itself indicate that the mineral interests were not to be the subject of partition as the word is used in that Act. S. Rep. No. 1632, 83d Cong., 2d Sess., 6 (1954); H. R. Rep. No. 2493, 83d Cong., 2d Sess. (1954); 25 U. S. C. § 677i. Thus, the failure of Congress to extend sovereign immunity to the unpartitioned mineral interests here in issue strongly suggests that immunity has been waived as to these claims. Moreover, the only other immunity provision of the Act, 25 U. S. C. § 677h, applies only where there has been consent by the authorized representatives of the mixed-blood group which was necessarily absent because of the defect in the creation of the Ute Distribution Corp.