608 F.Supp.2d 672 (2009)
In re MUTUAL FUNDS INVESTMENT LITIGATION.
In re RS Investment Subtrack Parthasarathy
v.
RS Investment Management, L.P., et al.
MDL No. 04-MD-15863. Civil No. JFM-04-3798.
United States District Court, D. Maryland.
April 14, 2009.

MEMORANDUM
J. FREDERICK MOTZ, District Judge.
On December 30, 2008, 590 F.Supp.2d 741, I issued an opinion addressing motions for summary judgment in the Putnam and Janus subtracks. I reserved ruling *673 on the defendants' summary judgment motions filed in the RS subtrack because of the illness of counsel. On January 27, 2009, I heard oral argument on those motions. The motions will be granted.[1]

I. Market Timing Omissions Claim
Liability arises under Rule 10b-5(b) only when a defendant "make[s] any untrue statement of a material fact or [] omit[s] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). As I wrote in an earlier opinion, the language in certain prospectuses was misleading because it "failed to curein-fact, exacerbatedthe underlying wrong: manipulative and deceptive conduct in facilitating, while not disclosing, widespread ... market timing in the funds." In re Mut. Funds Inv. Litig., Janus Subtrack, 384 F.Supp.2d 845, 864 (D.Md.2005) "(In re Mut. Funds Inv. Litig. II").[2]
Unlike the prospectuses in the Janus and Putnam subtracks, the RS prospectuses said nothing at all about market timing. The words "market timing," "short-term trading," "rapid trading," and "excessive trading" do not appear. The only relevant portion of the prospectuses states:
Shares of one Fund may be exchanged for shares of another Fund.... However, you may not exchange your investment more than four times in any 12-month period (including the initial exchange of your investment from that Fund during the period, and subsequent exchanges of that investment from other Funds or the RS Money Market Fund during the same 12-month period).
(See, e.g., Prospectus, RS Investment Trust, May 1, 2002, Pls.' Ex. A, at 43.)
Plaintiffs assert that the prospectuses omitted to include statements regarding market timing that were necessary to make this exchange language in the prospectuses not misleading. Plaintiffs claim that the exchange language presents a policy prohibiting market timing, and that "investors reading the exchange limitation reasonably understood it to bar any rapid purchasing or selling, in addition to strict exchanges, as well since both activities would detrimentally impact the RS funds portfolio and its management." (Pls.' Mem. in Opp'n to the RS Individuals' Mot. for Summ. J. 8.) In support, plaintiffs cite Peter Keith's deposition testimony that the exchange limitation was "to act as more of a deterrent towards short term market timing, to demonstrate that it was not a practice we encouraged." (Keith Dep. 140:21-25, Dec. 3, 2003, Pls.' Ex. P.) Keith, RS Vice-President of Sales, testified further that the exchange limitation "gave [RS] the ability to restrict or revoke exchange *674 privileges from direct investors," particularly individual investors who were "exchanging frequently by making calls towards the end of market close." (Id. 140:25-141:6.)[3]
However, whatever Keith himself may have believed, the RS prospectuses said nothing at all about market timing and cannot reasonably be read as implying that RS was taking measures to curtail market timing in its funds. While the number of exchanges an investor could make was indeed limited under the prospectuses, no similar limitation was placed on purchases or sales. A market timing strategy could be pursued without violating the plain language of the prospectus through purchases and redemptions, even where the same transactions conducted using exchanges would be prohibited by the prospectuses. Thus, a reasonable investor would not have construed the exchange limitation as prohibiting market timing in the RS funds.
Other RS executives confirm this interpretation of the exchange provision. According to George Hecht, the CEO of RS, "when that provision was put in place [in 1994], the purpose of it was to protect against the transfer of hot money between one equity fund and another equity fund. And in fact, it couldn't have dealt with timing, because in order to time, through the exchange language you would have to have a money market fund, which we didn't have." (Hecht Dep. 100:20-25, Jan. 15, 2004, Defs.' Ex. 9.) Hecht stated in his SEC deposition:
if we'd wanted to control timing, we would have had to have had a provision that was included in the purchase and sale of the prospectus.... The purchase and sale door had no restrictions on it whatsoever. Anybody could have climbed through the purchase and sale door anytime they wanted, pursuant to the prospectus, as long as they wanted, unless they violated being abusive to the fund. In which case, in our fund group we had the portfolio manager remove them, or ask for their removal.
(Id. 102:6-8; 15-21.) Steven Cohen, CFO of the RS Advisors, and James Callinan, Portfolio Manager of the RS Emerging Growth Fund, likewise asserted that the exchange provision's purpose had nothing to do with timing. (Cohen Dep. 143:7-21, Jan. 8, 2004, Defs.' Ex. 10; Callinan Dep. 80:24-81:6, Jan. 13, 2004, Defs.' Ex. 8.) Rather, according to defendants, the exchange limitations were adopted "as a cost-cutting measure to reduce the nominal management cost incurred by a fund in exchanges, e.g., transfer agent and custody costs." (Defs.' Mem. 9 n. 4.)
Although a party "assumes a duty to provide complete and nonmisleading information with respect to subjects on which he undertakes to speak," Rubin v. Schottenstein, Zox & Dunn, 143 F.3d 263, 268 (6th Cir.1998), defendants did not "undertake[ ] to speak" about market timing in the prospectuses. Defendants "spoke" only about exchange limitations, and that statement cannot be construed as referring to market timing. "The proposition that silence, absent a duty to disclose, cannot be actionably misleading, is a fixture in federal securities law." Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1202 (1st Cir.1996), superseded by statute on other grounds, 15 U.S.C. § 78u-4(b)(1)-(2). Plaintiffs have shown no material misrepresentation *675 or omission regarding market timing that defendants were under a duty to correct.
Moreover, the record reflects that defendants generally did not know or believe that market timing could harm the RS funds.[4] The undisputed evidence shows that the pricing of the NAV was rarely susceptible to staleness, limiting any opportunities for timers to exploit inefficiencies by market timing. (See Defs.' Ex. 36 [Garrett Report, at 21-24, Exs. 5-6].) RS had no international funds where the potential dangers of market timing were most obvious.[5] Further, the undisputed fact that many RS officers and executives were themselves making longterm investments in the RS funds indicates that they did not believe the value of their investments was being undercut by market timers. In fact, in addition to large direct investments, the entire 401(k) retirement savings of the RS Chief Financial Officer was invested in the RS mutual funds. (Cohen Decl. ¶ 4.)
Because the prospectuses were not misleading as to RS's position towards market timing, defendants' motion for summary judgment as to claims based on material omissions is granted.

II. Misrepresentation Claim
RS did make an "untrue statement of a material fact" by representing in the prospectuses that its investors could not make exchanges more than four times in a twelve-month period, while at the same time entering into explicit agreements allowing investors to violate this provision of the prospectuses.
This claim, though, fails on the reliance element. This element "ensures that, for liability to arise, the `requisite causal connection between a defendant's misrepresentation and a plaintiff's injury' exists as a predicate for liability." Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 128 S.Ct. 761, 769, 169 L.Ed.2d 627 (2008) (quoting Basic Inc. v. Levinson, 485 U.S. 224, 243, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)). Plaintiffs argue that reliance can be satisfied using the presumption established in Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). *676 However, the Affiliated. Ute presumption applies only in cases primarily involving omissions, given the difficult problem of proving reliance in those circumstances. See In re Mut. Funds Inv. Litig. II, 384 F.Supp.2d at 863-64 (noting that "the Affiliated Ute presumption applies only where a plaintiff's claim is primarily based upon material omissions"). "Requiring a plaintiff to show a speculative state of facts, i.e., how he would have acted if omitted material information had been disclosed... would place an unnecessarily unrealistic evidentiary burden on the Rule 10b-5 plaintiff who has traded on an impersonal market." Basic Inc., 485 U.S. at 245, 108 S.Ct. 978 (citing Ute, 406 U.S. at 153-54, 92 S.Ct. 1456) (other citations omitted). "Because of such problems, the Court in Ute held that where fraudulent conduct involves `primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery.'" Edens v. Goodyear Tire & Rubber Co., 858 F.2d 198, 207 (4th Cir.1988) (quoting Ute, 406 U.S. at 153, 92 S.Ct. 1456).
As explained above, the prospectuses contained no material omission as to market timing. All that remains is the affirmative misrepresentation contained in the exchange limit provision. In affirmative misrepresentation cases, plaintiffs must demonstrate they actually relied on the false statement. See Burke v. Jacoby, 981 F.2d 1372, 1378 (2d Cir.1992) ("In connection with a claim that the defendant has affirmatively made false statements, plaintiff must demonstrate that he or she relied on the misrepresentation when entering the transaction that caused him or her economic harm."). Plaintiffs have presented absolutely no evidence (and indeed have made no argument) as to this element of the claim. Although deposition testimony from the plaintiffs establishes that some plaintiffs may have at some point read the prospectuses, plaintiffs' testimony does not in any way show they were influenced by the prospectus language. (See Goldman Dep. 76:5-79:5, 81:22-84:2, Jan. 28, 2008, Defs.' Ex. 7; Skripsky Dep. 59:8-63:21, Nov. 19, 2007, Defs.' Ex. 13; Hegstrom Dep. 17:20-21:19, 157:2-160:19, Jan. 25, 2008, Defs.' Ex. 14; Cacciola Dep. 37:12-50:12, 60:19-64:10, Apr. 18, 2008, Defs.' Ex. 15.) Therefore, defendants are entitled to summary judgment on this claim. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (to withstand summary judgment, the nonmoving party's evidence must be "significantly probative"); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
A separate order effecting the rulings made in this Memorandum is being entered herewith.

ORDER
For the reasons stated in the accompanying memorandum, it is, this 14th day of April, 2009,
ORDERED:
1. Defendants' summary judgment motion is granted; and
2. Judgment is entered in favor of defendants against plaintiffs.
NOTES
[1] This memorandum specifically addresses the claims against RS Investments. It follows a fortiori from my rulings on the RS Investments motion that the motions filed by the individual defendantsGeorge Hecht, Steven Cohen, James Callinan, Peter Keith and Michael McCaffreyshould also be granted.

I also note that during oral argument plaintiffs agreed that defendants are entitled to summary judgment as to the 36(b) claim because of the one-year look back period.
[2] For the reasons set forth in the opinion I entered on December 30, 2008, see In re Mut. Funds Inv. Litig., 590 F.Supp.2d 741, 749-50 (D.Md.2008), and the Memorandum I am entering today denying plaintiffs' motion to clarify or reconsider my ruling that I will not grant plaintiffs leave to further amend their complaints to assert claims for not disclosing that uncontrollable market timing was occurring in Janus and Putnam mutual funds, plaintiffs here are not entitled to assert a similar claim against the RS defendants. Moreover, if such a claim could be asserted here, defendants would be entitled to summary judgment on it because, as stated infra, the record is clear that defendants did not believe that market timing was damaging long-term shareholders in the RS funds.
[3] When Keith was asked whether he had "an understanding that the exchange limitation language in the R.S. Funds' prospectus was a prohibition against market timing," Keith answered no. (Keith Dep. 142:8-12, Pls.' Ex. P.) Keith clarified that while he saw the exchange limitation "as a way for [RS] to show or have a deterrent against market timing," he "never even thought that language in there required [RS] to restrict every investor to four exchanges." (Id. 142:13-17.)
[4] Callinan testified in his deposition before the SEC that RS executives "always operated under ... the assumption that market timing was an acceptable institutional strategy" that "was a losing strategy" because "more often than not the timer was not going to be correct on timing the market." (Callinan Dep. 87:25-88:7, Defs.' Ex. 8.) Callinan stated he believed timers would help the fund on some days "because they were exiting the market right at the wrong time or ... were putting cash in at the top and pulling ... cash out at the bottom and ... having antidilutive effects as much as they'd have dilutive effects." (Id. 89:19-25.) He testified that he "was not aware of any way [timers] could hurt the fund, did not think that it would disrupt fund operations and felt that their strategy was a losing strategy by definition." (Id. 67:22-25.) Defendants asserted at oral argument that the sticky asset agreements were believed to benefit the fund, because long-term investments were made in the same funds in which timing was permitted. Defendants realized that timing money could come with heavy transaction costs, but on balance tolerated this trade-off to get more money into the fund in order to help all investors.
[5] Plaintiffs point to evidence that on one occasion in 2002, when a significant decline in the stock market had decreased the asset levels within the Emerging Growth Fund, Callinan became concerned that excessive inflows or outflows could disrupt the fund. Therefore, certain traders were restricted. Once the stock market rallied in December 2002, Callinan determined that the fund could again accommodate short-term trading without disruption to the fund. Thus, while the evidence cited by plaintiffs at first blush appears to contradict defendants' position, when considered in context it confirms RS's good faith belief that as a general proposition market timing would not affect other investors.