Joe EDENS, Jr.; H. Dan Avant; Lloyd M. Kapp; Thomas B. McTeer, Jr.; Thomas O. Milliken, d/b/a North Strand Investments, a South Carolina General Partnership, Plaintiffs–Appellees,

v.

GOODYEAR TIRE & RUBBER COMPANY, Defendant–Appellant.

No. 87–2677.

United States Court of Appeals, Fourth Circuit.

Argued April 5, 1988.

Decided Sept. 29, 1988.

Rehearing and Rehearing In Banc Denied Dec. 7, 1988.

William O. Sweeny, III (Rebecca Laffitte, Nelson, Mullins, Riley & Scarborough, Columbia, S.C., on brief), for defendant-appellant.

Charles Porter, Edwin Russell Jeter, Jr. (T. Parkin Hunter, McNair Law Firm, P.A., Columbia, S.C., on brief), for plaintiffs-appellees.

Before PHILLIPS, MURNAGHAN and WILKINS, Circuit Judges.

WILKINS, Circuit Judge:

Goodyear Tire and Rubber Company appeals from a judgment for actual and punitive damages in favor of North Strand Investments for breach of contract accompanied by a fraudulent act. We affirm.

## I.

Since Goodyear appeals from a jury verdict and the denial of a motion for judgment notwithstanding the verdict, we consider the evidence in the light most favorable to North Strand Investments. *Evington v. Forbes*, 742 F.2d 834, 835 (4th Cir. 1984). North Strand is a South Carolina general partnership formed in 1979 for the purpose of purchasing the North Strand Shopping Center in North Myrtle Beach, South Carolina which it resold in 1983 to Wespac Investors Trust for approximately $2,000,000.00. North Strand retained title to a lot adjacent to the parking area for the purpose of building a Goodyear tire store on it. Wespac separately contracted to pay $497,500.00 for the lot, if within one year North Strand constructed a building on it and obtained a lease from Goodyear. In the event that a lease was not obtained, title to the lot would be transferred to Wespac without monetary consideration.

After several months of preliminary negotiations, in November 1983 Goodyear presented North Strand with a proposed lease agreement. North Strand signed the lease in December 1983 and returned it to Goodyear. Modification by mutual consent resulted in a final lease being executed in April 1984. The lease imposed on Goodyear the responsibility for providing final plans and specifications for the construction of a building by North Strand. The lease established a completion date of June 1, 1984, but allowed a 90–day extension for delay due to unavoidable contingencies.

Although Goodyear had provided preliminary plans for the building in December 1983 prior to the lease being finalized, final plans were not furnished until June 6, 1984. The plans were subject to North Strand's approval and Goodyear advised North Strand not to begin construction until they were so approved. Negotiations regarding changes continued into September 1984 and the parties never arrived at agreement on the final plans. As a result, construction never commenced.

The June 1 completion date was agreed upon in the early stages of negotiations, but when the finalization of the lease was delayed until April 1984, North Strand requested an extension of the completion date until October 1, 1984. Goodyear did not respond to this request and North Strand did not pursue it. After the final plans were delivered on June 6, North Strand requested an extension until March 1, 1985. Following its somewhat unusual, yet customary procedure, Goodyear drafted a "proposed Lease Amendment" requesting an extension on behalf of North Strand and forwarded it with instructions that all copies be signed by North Strand and returned to Goodyear. In its cover letter of September 5, 1984, Goodyear stated that the extension was "subject to approval and signature by Goodyear Management in Ak-

ron, Ohio." The proposed amendment specifically requested that "[i]f the foregoing change is acceptable to you, will you please so indicate by signing and returning to the undersigned the attached carbon copy of this letter." Lloyd Kapp signed the proposal on behalf of North Strand and returned the copies to Goodyear on September 10. Paul J. Smith, national director of real estate for Goodyear signed the proposal, but it was never returned to North Strand.

■ Meanwhile, Goodyear's region management became dissatisfied with the site "due to the lack of viability of the shopping center in which the facility [was] proposed." On or before October 12, 1984, R.W. Frederick, an administrative assistant in the real estate department, met with Dave Siladie of the architectural division and legal counsel Bill Runyan to discuss cancellation of the lease. Frederick documented this discussion in a memorandum as follows:[1]

> Runyan felt that if we cancelled using the fact that completion date had not been met we could have a problem with litigation in that an extension of said completion date was in the works.
>
> He suggested that our fieldman (Freed) converse with the Landlord and advise him that because of the delays on the finalization of plans we are no longer interested in this location. If that works we'll need a mutual cancellation agreement. If not we'll have to cancel using completion date and take our chances....

On October 19, 1984, L.J. Thompson, manager of location development, advised Smith of region management's desire to cancel the lease and requested that he "pursue the Law Department for a determination if the lease can be cancelled."

During approximately this same time period, R.K. Freed, southern region real estate manager for Goodyear, informed Michael Edwards, North Strand's real estate agent, that Goodyear had "lost interest in the area and no longer wanted to put a Goodyear store there on [the] site." Edwards subsequently met with Freed in Atlanta, Georgia in late October. Although they discussed the request for the extension at that meeting, Freed did not inform Edwards that Smith had approved and signed the extension. Freed offered mutual cancellation which Edwards refused.

Edwards left the meeting with the impression that Goodyear was going to continue with the deal. However, on December 4, 1984 Thompson reiterated dissatisfaction with the site and directed Frederick to consult the legal department again, stating: "It is desired that every avenue of lease cancellation be pursued." Shortly thereafter on December 10, 1984, Smith notified North Strand of Goodyear's decision to cancel the lease. Goodyear gave as its justification North Strand's failure to complete construction by the June 1 deadline plus the 90–day extension provided for under the original terms of the lease.

North Strand subsequently brought suit, initially alleging breach of contract. After the Goodyear internal memoranda and signed extension were produced during discovery, North Strand amended its complaint to allege a claim for breach of contract accompanied by a fraudulent act, seeking punitive damages. At trial, except for a few documents introduced during cross-examination of witnesses for North Strand, Goodyear presented no evidence and offered no testimony. Consequently, much of the critical testimony given by North Strand's witnesses was uncontradicted. The jury returned a verdict for North Strand, awarding $277,517.00 in actual damages and $675,000.00 in punitive damages. The district court denied Goodyear's motions for judgment notwithstanding the verdict and for a new trial and awarded North Strand prejudgment interest.

Goodyear appeals the judgment on numerous assignments of error, primarily ar-

---

**1.** At trial Goodyear opposed the admission of this document, asserting an attorney-client privilege. However, it had waived any arguable privilege by producing the memorandum during discovery without objection. *United States v. Mierzwicki,* 500 F.Supp. 1331, 1334 (D.Md.1980); *see also United States v. Martin,* 773 F.2d 579, 584 (4th Cir.1985).

guing that North Strand failed to establish a prima facie case of breach of contract accompanied by a fraudulent act. Goodyear also challenges certain jury instructions. We find that North Strand presented sufficient evidence to establish its prima facie case and that the district court properly instructed the jury.

## II.

The primary question presented is whether, under the law of the State of South Carolina, North Strand has established the essential elements of a claim for breach of contract accompanied by a fraudulent act sufficient to support the award of actual and punitive damages. *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Since the turn of the century, it has been well settled in South Carolina that punitive damages may be recovered for breach of contract accompanied by a fraudulent act.[2]

Over the years the South Carolina appellate courts have found a wide variety of factual allegations sufficient to constitute a claim for fraudulent breach of contract. *Welborn v. Dixon*, 70 S.C. 108, 49 S.E. 232 (1904); *Blackmon v. United Ins. Co.*, 233 S.C. 424, 105 S.E.2d 521 (1958); *Harper v. Ethridge*, 290 S.C. 112, 348 S.E.2d 374 (Ct. App.1986). And they have repeatedly refused to limit the type of acts giving rise to liability for breach of contract accompanied by a fraudulent act, instead providing that:

> Fraud assumes so many hues and forms, that courts are compelled to content themselves with comparatively few general rules for its discovery and defeat, and allow the facts and circumstances peculiar to each case to bear heavily upon the conscience and judgment of the court or jury in determining its presence or absence.

*Wright v. Public Savings Life Ins. Co.*, 262 S.C. 285, 289, 204 S.E.2d 57, 59 (1974) (quoting *Sullivan v. Calhoun*, 117 S.C. 137, 139, 108 S.E. 189 (1921)); *see also Harper*, 290 S.C. at 119, 348 S.E.2d at 378. In most cases, the courts have affirmed submission of these claims to the jury and affirmed the resulting awards of punitive damages. *Davis v. Life Ins. Co. of Virginia*, 195 S.C. 406, 11 S.E.2d 433 (1940); *Porter v. Mullins*, 198 S.C. 325, 17 S.E.2d 684 (1941); *West v. Service Life & Health Ins. Co.*, 220 S.C. 198, 66 S.E.2d 816 (1951); *Davis v. Bankers Life & Casualty Co.*, 227 S.C. 587, 88 S.E.2d 658 (1955); *Corley v. Coastal States Life Ins. Co.*, 244 S.C. 1, 135 S.E.2d 316 (1964); *Thompson v. Home Security Life Ins.*, 271 S.C. 54, 244 S.E.2d 533 (1978); *Floyd v. Country Squire Mobile Homes, Inc.*, 287 S.C. 51, 336 S.E.2d 502 (Ct.App.1985); *Scott v. Mid Carolina Homes, Inc.*, 293 S.C. 191, 359 S.E.2d 291 (Ct.App.1987); *Glover v. North Carolina Mutual Life Ins. Co.*, 295 S.C. 251, 368 S.E.2d 68 (Ct.App.1988). The courts occasionally have sustained demurrers to complaints attempting to state a claim for breach of contract accompanied by a fraudulent act where plaintiffs failed to allege fraudulent intent or a fraudulent act. *Patterson v. Capital Life & Health Ins. Co.*, 228 S.C. 297, 89 S.E.2d 723 (1955); *Roberts v. Fore*, 231 S.C. 311, 98 S.E.2d 766 (1957); *Vann v. Nationwide Ins. Co.*, 257 S.C. 217, 185 S.E.2d 363 (1971); *Smith v. Canal Ins. Co.*, 275 S.C. 256, 269 S.E.2d 348 (1980); *Save Charleston Foundation v. Murray*, 286 S.C. 170, 333 S.E.2d 60 (Ct.App.1985). And jury awards of punitive damages on such claims have been reversed only where there was a failure of proof of a requisite

---

2. *See* Note, *Punitive Damages for Breach of Contract in South Carolina*, 10 S.C.L.Q. 444 (1958). In contrast, other states in this circuit do not allow punitive damages for breach of contract unless the conduct constitutes an independent and willful tort. *McDaniel v. Bass–Smith Funeral Home, Inc.*, 80 N.C.App. 629, 343 S.E.2d 228 (1986); *Hayseeds, Inc. v. State Farm Fire & Cas.*, 352 S.E.2d 73 (W.Va.1986); *Gasque v. Mooers Motor Car Co.*, 277 Va. 154, 313 S.E.2d 384 (1984); *Brand Iron, Inc. v. Koehring Co.*, 595 F.Supp. 1037 (D.Md.1984). In fact, it appears that South Carolina is the only state in the nation which permits punitive damages for conduct which does not give rise to an independent tort claim. *See* 22 Am.Jur.2d *Damages* § 245 (1965); J. Calamari & J. Perillo, The Law of Contracts § 14–3 (2d ed. 1977). While New Mexico recognizes a claim for punitive damages for breach of contract accompanied by a fraudulent act, it further requires that the act be "wanton in character and maliciously intentional." *Whitehead v. Allen*, 63 N.M. 63, 66, 313 P.2d 335, 336 (1957).

element. *Ray v. Pilgrim Health & Life Ins. Co.*, 206 S.C. 344, 34 S.E.2d 218 (1945); *Hardee v. Penn Mutual Ins. Co.*, 215 S.C. 1, 53 S.E.2d 861 (1949); *Gavin v. North Carolina Mutual Ins. Co.*, 265 S.C. 206, 217 S.E.2d 591 (1975); *Rutledge v. St. Paul Fire & Marine Ins. Co.*, 286 S.C. 360, 334 S.E.2d 131 (Ct.App.1985).

From this body of South Carolina law, several basic principles have emerged. First, a claim for breach of contract accompanied by a fraudulent act is not a claim separate and apart from one for breach of contract. *Smith v. Canal Ins. Co.*, 275 S.C. at 260, 269 S.E.2d at 350. Rather, proof that a breach of contract was accompanied by a fraudulent act is a predicate for recovery of punitive damages. *Id.* Further, a claim for breach of contract accompanied by a fraudulent act does not require proof of the same elements as a tort claim for fraud and deceit. *Harper v. Ethridge*, 290 S.C. at 118, 348 S.E.2d at 378. "However, mere breach of a contract, even if willful or with fraudulent purpose, is not sufficient to entitle a plaintiff to go to the jury on the issue of punitive damages." *Floyd v. Country Squire Mobile Homes, Inc.*, 287 S.C. at 53, 336 S.E.2d at 503. To establish a breach of contract accompanied by a fraudulent act and recover punitive damages, a plaintiff must prove three elements: (1) breach of contract, (2) fraudulent intent relating to the breach, and (3) a fraudulent act accompanying the breach. *Id.; Harper*, 290 S.C. at 119, 348 S.E.2d at 378.

## A.

■ To establish a breach of contract, North Strand was first required to prove the existence of a contract. Goodyear contends that North Strand failed to establish this, asserting that the evidence did not show a meeting of the minds or a mutual manifestation of assent regarding the construction plans and specifications or the completion date. North Strand maintains that the completion date and final approval of the plans were conditions precedent to performance of the contract, not to its formation. While there was conflicting evidence on this issue, it was clearly one for resolution by a jury.

As the trial court correctly charged the jury, mutual assent to all essential terms of an agreement is necessary to formation of a contract. *W.E. Gilbert & Associates v. South Carolina Nat'l Bank*, 285 S.C. 421, 330 S.E.2d 307 (Ct.App.1985). The lease executed by both parties clearly shows that they agreed to a completion date of June 1, 1984 and that Goodyear was responsible for providing construction plans and specifications for North Strand's approval. The question of whether approval of the plans and completion of the building were conditions precedent to the formation of the contract or to Goodyear's duty of performance depends on the intent of the parties. *Champion v. Whaley*, 280 S.C. 116, 122, 311 S.E.2d 404, 408 (Ct.App.1984). In its answer, Goodyear admitted that it "entered into a lease agreement with [North Strand] contingent on certain terms and conditions being met prior to finalization of the lease." Goodyear also characterized the conditions as precedent to its performance under the contract.

■ Goodyear further contends that North Strand failed to present evidence that it breached the contract, and that it was North Strand who breached the contract by failing to timely construct the building. As the jury was properly charged, generally the party suing on a conditional contract has the burden of proving that the conditions to performance have been met. *Id.* at 120, 311 S.E.2d at 406. However, if one party prevents a condition from occurring, then the condition is excused and he cannot rely upon the other party's resulting nonperformance. *Id.* The uncontradicted evidence of Goodyear's failure to provide the required construction plans and specifications prior to the completion date was sufficient to support a finding by the jury that Goodyear breached the contract and prevented North Strand from fulfilling the conditions.

## B.

■ At trial North Strand sought to prove the remaining elements of fraudulent

intent and a fraudulent act by presenting evidence that Goodyear offered a false excuse for cancelling the lease and withheld information that the extension had been granted. Goodyear argued that, even if proven, these contentions were insufficient to support a claim for punitive damages. We agree that offering a false excuse for cancellation of a contract, standing alone, would have been insufficient to establish breach of contract accompanied by a fraudulent act. However, if the jury found, as it obviously could have, that Goodyear granted an extension and then intentionally concealed that information, this would constitute a separate and distinct fraudulent act sufficient to support an award of punitive damages.

In an ordinary breach of contract case, the motive of the breaching party is irrelevant to a determination of damages. *Holland v. Spartanburg Herald–Journal Co.*, 166 S.C. 454, 465, 165 S.E. 203, 207 (1932). However, in a claim for breach of contract accompanied by a fraudulent act, motive is relevant to the requisite element of fraudulent intent.[3] Normally this element is proven by circumstances surrounding the breach. *Scott v. Mid Carolina Homes, Inc.*, 293 S.C. at 197, 359 S.E.2d at 295. Here Goodyear's internal memoranda clearly support a jury finding of fraudulent intent.

Proof of fraudulent intent alone does not justify an award of punitive damages because a fraudulent act accompanying the breach must also be established. *Floyd v. Country Squire Mobile Homes, Inc.*, 287 S.C. at 54, 336 S.E.2d at 503, 504. "The fraudulent act is any act characterized by dishonesty in fact, unfair dealing, or the unlawful appropriation of another's property by design."[4] *Harper v. Ethridge*, 290

S.C. at 119, 348 S.E.2d at 378. The act must be separate and distinct from the breach itself, but still must be closely connected with it and "not be too remote in either time or character." *Smith v. Canal Ins. Co.*, 275 S.C. at 260, 269 S.E.2d at 350; *Floyd*, 287 S.C. at 54, 336 S.E.2d at 504; *Davis v. Bankers Life & Cas. Co.*, 227 S.C. at 592, 88 S.E.2d at 660.

Goodyear's false excuse for cancelling the lease was not sufficiently separate and distinct from the breach to constitute an accompanying fraudulent act. However, proof that Goodyear granted an extension and intentionally concealed that information while claiming North Strand's failure to meet the initial completion date as justification for cancellation, would be a separate and distinct, but closely connected, dishonest act sufficient to support an award of punitive damages.

### C.

The question remaining is whether the extension was in fact granted. Goodyear argues that although Smith signed the extension, it was not effective because it was not returned to North Strand. North Strand maintains that it was effective upon signing by Smith. The uncontradicted evidence presented by North Strand provides more than a sufficient basis on which the jury could have found that by Goodyear's own terms the extension was effective when signed by Smith.

Generally, an offeror is entitled to notification of acceptance unless the offer reveals a contrary intention. Restatement (Second) of Contracts § 56 comment a (1981). And under South Carolina law, "[a]ssent to an offer need not be expressed to constitute a contract, but may be inferred from acts and conduct." *Scott v.*

---

**3.** The trial court properly refused Goodyear's request to charge the jury that "whether the breach is willful or intentional or malicious has no bearing on the matter [of breach of contract accompanied by a fraudulent act] whatsoever."

**4.** In contrast, North Carolina requires proof of aggravated conduct such as fraud, malice or oppression. *McDaniel v. Bass–Smith Funeral Home, Inc.*, 343 S.E.2d at 231. And Maryland requires proof of malice, consisting of "an evil or rancorous motive influenced by hate; the purpose being to deliberately and wilfully injure the plaintiff." *Wiggins v. North American Equitable Life Assurance Co.*, 644 F.2d 1014, 1018 n. 2 (4th Cir.1981) (quoting *Food Fair Stores, Inc. v. Hevey*, 275 Md. 50, 55, 338 A.2d 43, 46 (1975)). *Accord Hayseeds, Inc. v. State Farm Fire & Cas.*, 352 S.E.2d 73 (W.Va.1986); *Kamlar Corp. v. Haley*, 224 Va. 699, 299 S.E.2d 514 (1983).

*Mid Carolina Homes, Inc.,* 293 S.C. at 197, 359 S.E.2d at 295. For example, where an offer provides that it "becomes a contract" or "shall take effect" when approved at the offeree's home office, such approval is an acceptance even though no steps are taken to notify the offeror. Restatement, *supra*, illustrations 1 & 2; *see Int'l Filter Co. v. Conroe Gin, Ice & Light Co.,* 277 S.W. 631 (Tex.Comm.App.1925); *Field v. Missouri Life Ins. Co.,* 77 Utah 45, 290 P. 979 (1930). Dispensing with notice may present practical problems since the offeror may not promptly learn of its duty to perform, but this does not affect the creation of an agreement which is binding on the offeree.

Here, North Strand requested an extension of the completion date. Goodyear then prepared "a proposed Lease Amendment" on North Strand's behalf and sent four copies to North Strand on September 5, 1984 for signature, directing that all four copies be returned to the regional office in Atlanta. Lloyd Kapp signed the document on behalf of North Strand and returned the copies to Atlanta on September 10. The copies were forwarded to Akron where they were signed by Smith, although North Strand was never notified of this approval.

The document was drafted by Goodyear as a letter from North Strand to the attention of the real estate department at Goodyear's main office in Akron. It provided that: "If the foregoing change is acceptable to you, will you please so indicate by signing and returning to the undersigned the attached carbon copy of this letter." However, in its cover letter, Goodyear expressly stated that the amendment was "subject to approval and signature by Goodyear Management in Akron, Ohio." The cover letter and the amendment are facially inconsistent regarding the necessity of notification. North Strand partner Lloyd Kapp testified on cross-examination without objection that it was his understanding from the cover letter that the extension was final upon approval and signature in Akron. Although Goodyear drafted both documents and created the conflict, it failed to offer any evidence on this issue. The uncontradicted evidence of Kapp's understanding was sufficient to support the jury's determination that the extension was effective when approved and signed by Paul Smith in Akron.

### III.

In comparing the facts here to those in similar cases where South Carolina courts have found that claims of breach of contract accompanied by a fraudulent act were sufficiently pled and affirmed awards of punitive damages, it is clear that North Strand's claim was properly submitted to the jury. For example, recently in *Harper v. Ethridge,* the South Carolina Court of Appeals held that a claim was sufficiently pled where one partner of a real estate development partnership alleged that the other partners dishonestly refused to renew or extend a promissory note, consent to reasonable development offers or arbitrate third-party offers, and wrongfully appropriated partnership assets and opportunities. 290 S.C. 112, 348 S.E.2d 374.

Harper was a member of a partnership formed to develop a convention center on a parcel of land on which it had an option. When it was unable to obtain the necessary financing, Ethridge was invited to join the partnership to provide additional financial strength. Pursuant to the agreement, Harper assigned the option to Ethridge and another partner, Fann, who obtained a purchase money loan and bought the property in trust for the partnership. Harper was responsible for his proportionate share of the taxes, interest and the loan balance, and his partnership interest was forfeitable if he failed to meet those responsibilities.

The agreement provided that the partners would search for a developer to repurchase the land and the proceeds would be used to pay off the loan and pay expenses with any profit to be distributed among the partners. The agreement further provided that if a partner presented a reasonable development plan and Ethridge and Fann withheld approval to the jeopardy of the interests of the other partners, the default provision would be suspended pending arbitration.

Harper arranged a contract with foreign investors but Ethridge refused to approve the proposal and then refused to arbitrate. Instead, Ethridge and Fann entered into an option with a local developer which was never exercised. When the loan matured, Ethridge and Fann refused to renew or extend the note. Rather, they declared Harper in default and invoked the forfeiture provision. Subsequently Ethridge and Fann entered into a contract with the same foreign investors under conditions substantially similar to those of Harper's previously rejected proposal.

The court of appeals held that these factual allegations were clearly sufficient to state a claim for breach of contract accompanied by a fraudulent act, finding that dishonest refusal to renew or extend the note evidenced fraudulent intent, and that wrongful appropriation of trust property and a partnership opportunity constituted accompanying fraudulent acts. In comparison, while the facts here are different since Goodyear did not refuse an extension or misappropriate any North Strand asset, the substance of the dishonest schemes are similar. Goodyear as well as Ethridge and Fann dishonestly created the excuses for ending their contractual relationships. And although Goodyear did not directly profit from those actions as did Ethridge and Fann, it did profit indirectly by avoiding anticipated losses on the lease.

In several cases, South Carolina courts have affirmed an award of punitive damages where a party offered a false excuse for breaching a contract and committed an accompanying fraudulent act. Recently in *Glover v. North Carolina Mutual Life Ins. Co.*, the South Carolina Court of Appeals affirmed a punitive damages award against an insurance company for cancellation of a life insurance policy. 295 S.C. 251, 368 S.E.2d 68. Ms. Glover had purchased the policy in November 1973 and timely paid her monthly premiums through August 1984. At the time she made the August 1984 payment, she requested a copy of her policy. Instead of providing a copy, North Carolina Mutual notified her that the policy had been cancelled ten years previously for failure to pay premiums. The court held that the jury could have found the insurance company's fraudulent intent was to induce Glover not to make further premium payments which would then cause the policy to lapse and that the accompanying fraudulent act was the collection of premiums after purportedly repudiating the contract. Both Goodyear and North Carolina Mutual attempted to avoid their contractual responsibilities by falsely claiming that North Strand and Glover had breached the respective contracts and each committed a separate accompanying fraudulent act.

The South Carolina Court of Appeals affirmed a punitive damages award against a mobile home dealer for breach of a sales contract in *Scott v. Mid Carolina Homes, Inc.*, 293 S.C. 191, 359 S.E.2d 291. After the Scotts signed a contract for the purchase of a mobile home and made a deposit, a Mid Carolina salesman informed them that he could not sell them the home because the frame was bent. Although the Scotts offered to accept the home and sign a release, the salesman stated that he was prohibited by state law from selling the home with a bent frame. In fact there was no such law and the same home was sold within the week to another purchaser for almost double the price quoted to the Scotts. And, after cancelling the contract, Mid Carolina cashed the Scotts' deposit check and refused to return their money until they threatened legal action.

The court held that fraudulent intent was inferable from the salesman's false excuse for cancelling the sale and that the jury could have viewed the false excuse in conjunction with the subsequent sale and the cashing of the deposit check as accompanying fraudulent acts. Here, fraudulent intent was inferable from Goodyear's internal memoranda and the false excuse, and intentional concealment of the extension could have been viewed by the jury as an accompanying fraudulent act.

In *Corley v. Coastal States Life Ins. Co.* a punitive damages award was affirmed where the defendant insurance company attempted to settle a beneficiary's claim for less than the amount owed. 244 S.C. 1, 135

S.E.2d 316. Mrs. Corley's husband had purchased a life insurance policy from Coastal States under which death benefits included the face value of the policy and also provided for return of all paid premiums. After the death of the insured a dispute arose about the amount of premiums to be returned. Coastal States informed Mrs. Corley through the state Insurance Commission of the total amount payable, but after she surrendered the policy, the company issued a check for substantially less. The company contended that the previous quotation was a good faith mistake in calculations arising from the unusual nature of the policy. However, the assistant secretary of the company who prepared the second set of calculations and issued the check, testified that he made a "deliberate decision" about the amount due. The court held that the jury could have inferred a breach of contract accompanied by a fraudulent act and that the issue was properly submitted to it. If those facts justified submission of a claim for punitive damages to the jury, the facts here similarly justify such submission, for in both situations the defendants offered "false" excuses in an effort to avoid their legal obligations.

If one party to a contract elects to breach it, he is responsible for the actual consequential damages resulting from the breach. *Holland v. Spartanburg Herald–Journal Co.,* 166 S.C. at 469, 165 S.E. at 208. If Coastal States had simply refused to pay the initially quoted amount due and offered to settle for less, or Mid Carolina had flatly refused to complete the sale, or North Carolina Mutual had only cancelled the policy, there would not have been any issues of fraudulent breach. *See Rutledge v. St. Paul Fire and Marine Ins. Co.,* 286 S.C. 360, 334 S.E.2d 131 (refusal to make payment on a fire insurance policy unless the insured agreed to take a polygraph test was not a fraudulent act); *Vann v. Nationwide Ins. Co.,* 257 S.C. 217, 185 S.E.2d 363 (refusal to pay medical expenses due under an automobile insurance policy unless the insured settled the uninsured motorist claim was not a fraudulent act). Similarly, if as proposed in the October

memorandum, Goodyear had simply cancelled using the missed completion date as an excuse and "taken its chances," North Strand could only have sought recovery for actual damages. Likewise, if Goodyear had notified North Strand that the extension had been approved and then cancelled the contract, it would only have been liable for actual damages.

Under South Carolina law, if a breach of contract is accomplished with fraudulent intent and accompanied by a fraudulent act punitive damages may also be awarded. Thus, by giving false excuses for breaching their contracts and otherwise dealing dishonestly and unfairly, Coastal States, Mid Carolina and North Carolina Mutual subjected themselves to liability for punitive damages. And here, evidence that Goodyear granted an extension of the completion date until March 1, 1985 but intentionally concealed that fact, and cancelled the lease in December 1984 using the excuse that North Strand failed to complete the building by the initial completion date was sufficient to support a jury finding of dishonesty or unfair dealing and an award of punitive damages.

### IV.

As the dissent correctly states, the South Carolina Supreme Court has held that when the fraudulent act accompanying a breach of contract is a misrepresentation, the plaintiff must prove reliance on the misrepresentation. *Kelly v. Nationwide Mut. Ins. Co.,* 278 S.C. 488, 489, 298 S.E.2d 454, 455 (1982) (citing *Vann v. Nationwide Ins. Co.,* 257 S.C. 217, 185 S.E.2d 363); *Rutledge v. St. Paul Fire & Marine Ins. Co.,* 286 S.C. at 365, 334 S.E.2d at 135. The dissent would reverse the award of punitive damages on the basis that North Strand failed to prove detrimental reliance on Goodyear's misrepresentation. However, the actionable independent fraudulent act here was not Goodyear's misrepresentation of its reason for cancellation, but rather its affirmative concealment of the extension of the completion date. And, direct proof of reliance on the concealment was not required for it was practically impossi-

ble to prove, by direct evidence, reliance on that which had been intentionally concealed.

As the United States Supreme Court has recognized, "cases involving omissions create difficult problems of proof of reliance." *Piper v. Chris–Craft Industries, Inc.,* 430 U.S. 1, 50, 97 S.Ct. 926, 954, 51 L.Ed.2d 124 (1977) (Blackmun, J., concurring) (citing *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972)). "Requiring a plaintiff to show a speculative state of facts, i.e., how he would have acted if omitted material information had been disclosed ... would place an unnecessarily unrealistic evidentiary burden on the ... plaintiff...." *Basic Inc. v. Levinson,* 485 U.S. ——, ——, 108 S.Ct. 978, 990, 99 L.Ed.2d 194, 217 (1988) (citing *Ute,* 406 U.S. at 153–54, 92 S.Ct. at 1472–72) (other citations omitted). Because of such problems, the Court in *Ute* held that where fraudulent conduct involves "primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery." *Ute,* 406 U.S. at 153, 92 S.Ct. at 1472.

*Ute* involved a securities fraud action for omission of material facts in connection with the purchase of stock. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b) (West 1981); S.E.C. Rule 10b–5, 17 C.F.R. § 240.10b–5 (1987). As is the case with a claim for fraudulent breach of contract, a securities fraud claim does not require proof of the traditional nine elements of a common law fraud claim, *see Basic,* 485 U.S. at —— n. 22, 108 S.Ct. at 990 n. 22, 99 L.Ed.2d at 216 n. 22, and the basic fraud element of reliance need not always be proven to establish claims for either securities fraud or fraudulent breach of contract.

Reliance is generally a requisite element of a 10b–5 claim, *id.* at ——, 108 S.Ct. at 989, 99 L.Ed.2d at 215, and it is also required where a fraudulent breach of contract claim arises from a misrepresenta-

tion. However, in nondisclosure cases, a 10b–5 plaintiff is relieved of the difficult, if not impossible, burden of producing direct evidence of reliance. And applying the same reasoning of the Court in *Ute* to the circumstances here, North Strand was excused from directly proving reliance, since the unfair or dishonest act accompanying the breach of contract was Goodyear's intentional concealment of the extension.[5]

Goodyear tacitly conceded that reliance was not a requisite element of North Strand's claim, for it never contended that North Strand was required to prove reliance on the concealment. At trial, Goodyear apparently did not request a charge on reliance and did not object to the district court's decision not to charge the jury that North Strand was required to prove reliance on the concealment to establish its claim for breach of contract accompanied by a fraudulent act. Further, Goodyear has made no such assertion on appeal.

## V.

Goodyear also contends that the court erred in charging the jury on the measure of actual damages. Considering the charge as a whole, we find that the instructions "fairly and adequately state[d] the pertinent legal principles involved." *Chavis v. Finnlines, Ltd.,* 576 F.2d 1072, 1076 (4th Cir.1978).

The district court instructed the jury that "the injured party in a contract dispute may recover as damages any profits which were prevented or lost because of the other party's breach." The contract price of the sale of the lot to Wespac with a building and Goodyear lease was $497,500.00 and the projected cost of development was $219,983.00. The jury awarded North Strand actual damages of $277,517.00, North Strand's lost net profit.

Goodyear contends that the court erred in refusing its request to charge the jury that "the allowance of compensatory damages is the difference between the real or

---

**5.** Despite the difficulty of direct proof, here reliance was clearly inferable from the fact that North Strand did not construct and tender a completed building by March 1, 1985, although the evidence showed it was ready, willing and able and would have done so had it known that Goodyear had granted the extension.

market value of the property and the contract price, and not the profits that might have accrued to the lessor." However, the district court's instruction correctly stated South Carolina law, under which "[l]ost profits are well recognized as a species of consequential damages" in breach of contract actions. *John D. Hollingsworth on Wheels, Inc. v. Arkon Corp.*, 279 S.C. 183, 186, 305 S.E.2d 71, 73 (1983).

AFFIRMED.

MURNAGHAN, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that there was adequate evidence in the record for the jury to find that there was a valid contract among the parties and that Goodyear Tire and Rubber Company had breached it. However, because the actions of Goodyear did not rise to the level of a "fraudulent act" accompanying a breach of contract pursuant to South Carolina law, I respectfully dissent from the affirmance of the award of punitive damages.

South Carolina courts repeatedly have explained that a mere breach of a contract, even if willful or with fraudulent purpose, is not sufficient to entitle a plaintiff to go to the jury on the issue of punitive damages. *E.g., Smyth v. Fleishmann*, 214 S.C. 263, 269, 52 S.E.2d 199, 202 (1949); *Holland v. Spartanburg Herald–Journal*, 166 S.C. 454, 464–65, 165 S.E. 203, 206–07 (1932). As recognized by the majority, in order to recover punitive damages in an action in contract, the plaintiff must prove a breach of contract *accompanied by a fraudulent act*. The plaintiff must show the following three elements: (1) a breach of contract, (2) fraudulent intent relating to the breach, and (3) a fraudulent act accompanying the breach. *Thompson v. Home Sec. Life Ins.*, 271 S.C. 54, 55, 244 S.E.2d 533, 534 (1978); *Floyd v. Country Squire Mobile Homes, Inc.*, 287 S.C. 51, 53–54, 336 S.E.2d 502, 503–04 (Ct.App.1985). The fraudulent act may be prior to, contemporaneous with, or subsequent to the breach of contract, but it must be connected with the breach itself and cannot be too remote

in either time or character. *Smith v. Canal Ins. Co.*, 275 S.C. 256, 260, 269 S.E.2d 348, 350 (1980). It is not disputed that elements of a breach of contract accompanied by a fraudulent act differ from the elements of the action in tort for fraud and deceit. *See Harper v. Ethridge*, 290 S.C. 112, 118–19, 348 S.E.2d 374, 378 (Ct.App. 1986).

The third element of the contract claim, the fraudulent act, is characterized as "dishonesty in fact, unfair dealing, or the unlawful appropriation of another's property by design." *Id.* at 119, 348 S.E.2d at 378. When the fraudulent act element is based on misrepresentation, as in the present case, South Carolina courts have held that the plaintiff must prove reliance on such misrepresentation, a rather universal—and indeed obvious—point. The South Carolina Supreme Court clearly explained as follows:

> In *Corley v. Coastal States Life Ins. Co.*, 244 S.C. 1, 135 S.E.2d 316 (1964), we held that a misrepresentation made in reckless disregard for the truth will support an action for breach of contract accompanied by a fraudulent act. However, in *Vann v. Nationwide Ins. Co.*, 257 S.C. 217, 185 S.E.2d 363 (1971), we explicitly recognized that reliance on the misrepresentation must also be proved.

*Kelly v. Nationwide Mut. Ins. Co.*, 278 S.C. 488, 489, 298 S.E.2d 454, 455 (1982). *See also Vann v. Nationwide Ins. Co.*, 257 S.C. 217, 221, 185 S.E.2d 363, 364–65 (1971); *Rutledge v. St. Paul Fire & Marine Ins. Co.*, 286 S.C. 360, 365, 334 S.E.2d 131, 135 (Ct.App.1985).

In the instant case, the majority holds that Goodyear's misrepresentation through concealment regarding the signing of the extension agreement was sufficient to meet the fraudulent act element. The plaintiffs, however, have failed to show any reliance on such misrepresentation. There is no evidence nor was there any apparent evidence that Goodyear gained anything by virtue of the misrepresentation, or that plaintiffs' claim for actual damages was prejudiced. *Kelly*, 278 S.C. at 489, 298 S.E.2d at 455. Under such circumstances,

the district court erred by denying Goodyear's motion for a directed verdict as to punitive damages.

The Supreme Court has recognized no distinction such as that advanced in the majority opinion between affirmative misrepresentation and failure to disclose. *See Basic Inc. v. Levinson,* —— U.S. ——, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). Additionally, it would be unwarranted action, disregarding the thrust of *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), to rely on such a supposed distinction, for the South Carolina courts have never relied conclusively on such a supposed distinction. If the distinction is relied upon by the majority, the defendant, who merely failed to disclose a piece of information, could face a greater threat of punitive damages than the defendant who told an outright lie. It would be illogical thus to lighten the burden in a case of mere failure to disclose as measured against the burden of proving reliance on the misrepresentation.

The majority's conclusion that the jury could properly infer detrimental reliance from Goodyear's silence is to me unwarranted. It is difficult to appreciate how North Strand would have been in a better position on December 10, 1984 (the date Goodyear cancelled the lease) if it had believed earlier that Goodyear had agreed to the extension.

Finally, the fact that the reliance issue has not been briefed or argued by Goodyear is in no way dispositive here. We have held that the appellate court "may *sua sponte* consider points not presented to the district court and not even raised on appeal by any party" if it is "deemed necessary to reach the correct result." *Washington Gas Light Co. v. Va. Elec. & Power Co.,* 438 F.2d 248, 251 (4th Cir.1971). *Accord Kirby v. Allegheny Beverage Corp.,* 811 F.2d 253, 256 n. 2 (4th Cir.1987); *Austin v. Torrington Co.,* 810 F.2d 416, 420 (4th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 489, 98 L.Ed.2d 487 (1987). It is well settled that we may consider an issue not raised at trial "if the error is 'plain' and if our refusal to consider such would result in the denial of fundamental justice." *Stew-*

*art v. Hall,* 770 F.2d 1267, 1271 (4th Cir. 1985) (trial judge's error in instructing jury resulted in a complete failure of proof with respect to the essential element of the cause of action).

It is necessary in this respect to consider the impact of the thrust of, and the limitations on, the doctrine announced in *United States v. Mercedes Benz,* 542 F.2d 912 (4th Cir.1976) and companion cases. That case intends to serve right the lawyer who contributes to a trial judge's error by failing to call to his or her attention a non-obvious point of law. Here, however, we are dealing with a basic, elemental concept, namely that reliance is required to trigger consequences of fraudulent misrepresentation. We deal here with what amounts to "plainly misstated fundamentally controlling substantive principles governing ... [the] right to recover." *Furka v. Great Lakes Dredge & Dock Co.,* 755 F.2d 1085, 1089 (4th Cir.1985), *cert. denied,* 474 U.S. 846, 106 S.Ct. 136, 88 L.Ed.2d 112 (1985) (reversing case on grounds of erroneous jury instructions, not objected to at trial, where such instructions went to the "soul of appellant's case"). By contrast, *United States v. Gravely,* 840 F.2d 1156 (4th Cir. 1988), concerned the proper sequence of proof at trial, not a fundamental principle of law.

Furthermore, cases in the *Mercedes Benz* mold have involved lapses in calling to the trial court's attention a rule of law concerning the merits of the controversy, not punishment for conduct independent of the merits. *See, e.g., Levy v. Kindred,* 854 F.2d 682 (4th Cir.1988) (review of judgment forcing defendants to return money obtained through fraud; no punitive damages awarded); *G. Heileman Brewing Co., Inc. v. Stroh Brewery Co.,* 843 F.2d 169 (4th Cir.1988) (rejecting defendant's arguments that state franchise law was inapplicable; no punitive damages involved); *Babb v. Olney Paint Co.,* 764 F.2d 240 (4th Cir. 1985) (rejecting argument that defendants breached fiduciary duties; no punitive damages). In cases involving punitive damages, the largely unbridled latitude entrusted to the jury warrants special care by appellate courts to ensure that the letter of the law guided the jury instructions.

In many instances, this Court's refusal to consider issues not raised at trial has had little or no effect on the outcome of the cases. *See, e.g., Wilkinson v. United States,* 677 F.2d 998, 1002 (4th Cir.), *cert. denied,* 459 U.S. 906, 103 S.Ct. 209, 74 L.Ed.2d 167 (1982) (although disinclined to consider issue not raised below, court considered point anyway and found it meritless); *Martin v. United States,* 780 F.2d 1147, 1150 n. 9 (4th Cir.1986) (court refused to address matter not raised below where another issue disposed of the case); *Sanderson v. Rice,* 777 F.2d 902, 905 n. 4 (4th Cir.1985), *cert. denied,* 475 U.S. 1027, 106 S.Ct. 1226, 89 L.Ed.2d 336 (1986) (same); *Newman v. Hy–Way Heat Systems, Inc.,* 789 F.2d 269, 271–72 (4th Cir.1986) (refusal to reverse on issue not raised below where no prejudice to appellant); *Barger v. Mayor & City Council of Baltimore,* 616 F.2d 730, 734–35 (4th Cir.), *cert. denied,* 449 U.S. 834, 101 S.Ct. 105, 66 L.Ed.2d 39 (1980) (issue not core-central to litigation because jury could have reached same result even if properly instructed). By contrast, the issue of reliance lies at the core of the punitive damages award in the instant case. Without proof of reliance, the jury could not properly have awarded punitive damages under South Carolina law.

*National Wildlife Federation v. Hanson,* 859 F.2d 313 (4th Cir., 1988) holds:

> While it is true that we ordinarily will not consider issues raised for the first time on appeal, we have recognized that in very limited circumstances, we may consider such an issue of the error is "plain" and our refusal to consider it would result in a miscarriage of justice. *Stewart v. Hall,* 770 F.2d 1267, 1271 (4th Cir.1985).

At 318.

Furthermore, appellate review of the reliance issue cannot be said to inflict injustice upon the plaintiffs when it was the plaintiffs who had the burden from the start of proving detrimental reliance. The plaintiffs failed to bear that burden, and, in fact, failed even to allege in their complaint that they had relied on Goodyear's concealment of the deadline extension.[1] It would be unjust, however, for this Court to uphold a punitive damages award when the plaintiffs are not entitled to it under South Carolina law.

I, therefore, dissent with respect to the issue of punitive damages.

---

1. The plaintiffs indirectly referred to the reliance issue in their complaint, but alleged only that the defendant's actions were ones upon which the plaintiffs "were expected to rely." (J.A. 9). The plaintiffs did not allege that they had in fact relied. In addition, during oral argument before the trial judge in response to a motion for judgment notwithstanding the verdict, plaintiffs' counsel again obliquely referred to the reliance issue: "The act is sending out a cancellation letter breaching a contract, for a false reason in an attempt to trick somebody into giving up their rights." (J.A. 353). Again, however, plaintiffs' counsel failed to allege that plaintiffs had, in fact, been misled to give up any of those rights.