900 F.2d 250
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
COKER'S MOBILE HOME PLAZA, INC., Plaintiff-Appellee,
v.
ITT COMMERCIAL FINANCE CORPORATION, Defendant-Appellant,
Tommy G. DODSON, Defendant,
v.
Larry W. COKER; Melinda A. Coker, Third Party Defendants-Appellees.
COKER'S MOBILE HOME PLAZA, INC., Plaintiff-Appellee,
v.
ITT COMMERCIAL FINANCE CORPORATION, Defendant-Appellant,
Tommy G. DODSON, Defendant,
v.
Larry W. COKER; Melinda A. Coker, Third Party Defendants.
 Nos. 89-2927, 89-2985.
 United States Court of Appeals, Fourth Circuit.
 Argued Jan. 10, 1990.
Decided March 13, 1990.
 
 Appeals from the United States District Court for the District of South Carolina, at Columbia. Matthew J. Perry, Jr., District Judge. (CA-86-1618-3-0).
 Clarke Wardlaw DuBose, Sinkler & Boyd, P.A., Columbia, S.C., for appellants.
 Robert Bruce Shaw, Nelson, Mullins, Riley & Scarborough, Columbia, S.C.; John Eagle Miles, Sumter, S.C., for appellee.
 Robert Y. Knowlton, Sinkler & Boyd, P.A., Columbia, S.C., for appellants.
 W. Thomas Causby, Nelson, Mullins, Riley & Scarborough, Columbia, S.C.; Mortimer M. Weinberg, Jr., Weinberg, Brown & McDougall, Sumter, S.C., for appellees.
 D.S.C.
 REVERSED AND REMANDED.
 Before DONALD RUSSELL and CHAPMAN, Circuit Judges, and WILLIAMS, United States District Judge for the Eastern District of Virginia, sitting by designation.
 CHAPMAN, Circuit Judge:
 
 
 1
 Coker's Mobile Home Plaza, Inc. ("Coker's), brought this action against ITT Commercial Finance Corporation ("ITT"), seeking actual and punitive damages for breach of contract accompanied by fraudulent acts. After the jury awarded Coker's $64,000 actual and $425,000 punitive damages, the district court denied ITT's motions for judgment notwithstanding the verdict (JNOV), new trial and remittitur. ITT appeals this ruling and also the denial of ITT's motion for sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure. For the reasons given below, we reverse the district court's denial of ITT's motion for JNOV, and remand the issue of Rule 11 sanctions to the district court for further consideration in accordance with our opinion.
 
 
 2
 * In July of 1983, Larry Coker ("Coker"), a mobile home retail dealer doing business as Coker's Mobile Home Plaza, Inc., agreed with Tidwell Industries, Inc. ("Tidwell"), to move ten Tidwell mobile homes from the lot of another dealer who was in default to Tidwell. Coker moved seven to a lot rented by Tidwell and three to his own lot.
 
 
 3
 A few days later, Tidwell requested that ITT send an agent to Coker to discuss establishing a floor plan line of credit, which would allow Coker's to finance through ITT its inventory purchases from mobile home manufacturers. The ITT agent told Coker that Tidwell sent him. Coker testified, however, that he told the agent that he had "no intentions of doing business with Tidwell," because previously they had placed homes on his floor plan without his consent. Regarding their discussions about the three homes on his lot, Coker testified further that
 
 
 4
 I [Coker] said, "The only thing I can do is the three homes that I have on my lot, I would be interested in buying them if they were at the right price." I said, "If you [ITT] want to establish me with a credit line with you for that purpose and for three houses only, then I will be glad to let you set me up with Tidwell.
 
 
 5
 After the parties signed a Security Agreement on July 15, 1983, Coker submitted to ITT a dealer information sheet dated July 15, 1983, which stated that Coker's line of credit would cover Tidwell as well as Craftsman and Fleetwood products. In its letter dated August 5, 1983, approving Coker's credit line, ITT included Tidwell as one of the manufacturers to be financed by ITT. On August 11, 1983, Tidwell notified ITT that Coker's had purchased the three homes and prepared a Certificate of Origin indicating title in Coker's name. ITT then financed the homes without, as was the usual practice, notifying Coker's. These homes were the only ones from Tidwell financed by ITT.
 
 
 6
 The parties disagree as to what each said and did regarding the status of the three homes. ITT argues that John Martin Baughcum, the general manager for Tidwell, testified that Coker told him over the telephone in July 1983 that Coker's had bought the three units, and that Coker's initially offered all of the homes for sale and, on September 9, 1983, sold one of them, the invoice amount of which was paid to ITT. Finally, ITT asserts it mailed corrected "Statements of Transaction" (ITT admits that the original was misaddressed) for the Tidwell units to Coker's on September 14, 1983, in accordance with Paragraph 2 of the Agreement, which states: "When you [ITT] advance funds you may send us a Statement of Transaction or other statement if you choose." Coker denies receiving this statement.
 
 
 7
 Coker's maintains that it never authorized the homes to be placed on its floor plan and asserts that it "never did anything which might be construed as accepting financial responsibility for [the homes]." As customary in the industry and as envisioned in Paragraph 10 of the Agreement, Tidwell, not Coker's, paid ITT's interest charges. Although Coker's denies knowledge of Tidwell's payment of interest charges, Coker's received from ITT each month a Statement of Outstandings summarizing Coker's account with ITT. On September 23, 1983, an ITT agent visiting Coker's asked where the units were. Coker claims that he denied that the homes were on his floor plan and that he spoke immediately by phone with the ITT flooring clerk and said that he had not bought the units and that they did not belong to his ITT floor plan. Later that day, the clerk noted on the inventory checklist that the units were "not supposed to be" on Coker's floor plan.
 
 
 8
 After February 1985, Tidwell stopped paying ITT the interest charges on the two Tidwell homes on Coker's lot, and ITT notified Coker's that Coker's was not responsible for the charges. When Coker called ITT claiming that Coker's was not responsible for the debt, the ITT employee allegedly threatened to ruin Coker's credit rating. Subsequently, Coker's sued Tidwell for money allegedly owed (apparently for the homes' storage costs) and attached the two remaining homes by legal process; in so doing Coker's alleged that they were owned by Tidwell. This action was stayed when Tidwell filed a petition for bankruptcy under Chapter 11. Coker's then refused to let ITT retrieve the homes unless ITT paid the accrued storage costs.
 
 
 9
 In July 1986, another wholesale finance company, Meritor Credit Corporation ("Meritor"), denied Coker's application for a $450,000 line of credit, despite having already given Coker's a temporary line of credit. Coker's claims that Meritor's denial resulted from the unfavorable credit report given by ITT to Meritor at Meritor's request, which showed that Coker's still owed interest on the two units and would neither pay for nor return them. ITT claimed Meritor's denial was due to the fact that a division of Meritor was already having problems with Coker's; this is supported by Kyle Johnson's testimony that his decision to deny Coker's application would have been the same even if ITT's credit report was favorable.
 
 
 10
 On May 13, 1986, Coker's filed a complaint against ITT, asserting that ITT breached the agreement by improperly placing the homes on Coker's floor plan and by not removing them; and that ITT committed an accompanying fraudulent act by "arranging without authority and contra to the provisions of the contract, for funds to be expended by the defendant [ITT] on behalf of [Coker's] all to its detriment in order to fraudulently, intentionally and willfully gain a financial advantage to the detriment of [Coker's]." ITT denied these allegations and counterclaimed for recovery of the principal and interest due on the two units and for conversion of the two units. ITT brought a third party action against Larry and Melinda Coker based upon their personal guaranties of Coker's obligations to ITT. The jury returned a verdict against ITT, awarding Coker's $64,000 actual and $425,000 punitive damages. The district court denied ITT's motions for JNOV, new trial and remittitur. ITT appeals.
 
 II
 
 11
 Under South Carolina law, to recover punitive damages for breach of contract accompanied by a fraudulent act, Coker's must prove three elements: (1) a breach of contract; (2) a fraudulent intent relating to the breach; and (3) a fraudulent act accompanying the breach. Floyd v. Country Squire Mobile Homes, Inc., 287 S.C. 51, 53-54, 336 S.E.2d 502, 503-04 (Ct.App.1985). In reviewing the district court's denial of ITT's motion for JNOV and, alternatively, new trial, our task is to determine if there was evidence from which a jury could properly find that Coker's had proved each of the essential elements of this cause of action. Austin v. The Torrington Co., 810 F.2d 416, 420 (4th Cir.), cert. denied, 484 U.S. 977, 108 S.Ct. 489, 98 L.Ed.2d 487 (1987).[1]
 
 A. Breach of Contract
 
 12
 ITT argues first that the district court erred in denying ITT's motions for directed verdict and JNOV because Coker's failed to prove any breach of contract. Coker's offers three ways that ITT breached the Security Agreement. First, it asserts that ITT breached the contract by placing the Tidwell units on the floor plan. The evidence, however, indicates otherwise. While it is uncertain, considering the evidence in the light most favorable to Coker's, whether the conversation between Coker and ITT's agent, recounted above, gave ITT authorization to floor plan Tidwell homes, the subsequent communications between the parties resolve this uncertainty. Concomitant with the parties' signing of the Security Agreement, which itself makes no reference to whose products were to be floor planned, Coker's sent a dealer information sheet to ITT listing Tidwell among the major products floor planned. ITT's confirming letter likewise included Tidwell. Coker's does not deny receiving this letter and did not complain at that time. These uncontroverted facts indicate clearly that ITT had the general authority to floor plan Tidwell homes for Coker's. The issue becomes whether ITT had the specific authority to floor plan the homes that Coker's had agreed to store for Tidwell.
 
 
 13
 In addressing this issue, we believe the evidence is similarly conclusive. Within a few days of ITT's confirmation letter, Tidwell notified ITT that Coker's had purchased the homes. In turn, ITT then financed the homes without notifying Coker's, according to its usual business practice. The Agreement did not require that ITT notify Coker's, and Coker's does not deny that this lack of notification was customary. Indeed, Coker's purchases of both Fleetwood and Craftsman products were executed the same way. Coker's only argument is that it told ITT on September 23, 1983, that it had not authorized putting the Tidwell homes on the floor plan, but this was almost two months after the parties had executed the Security Agreement and Coker's had submitted the dealer information sheet stating that its line of credit would cover Tidwell units. Moreover, Coker's successful sale of one of the homes and remittance of the invoice price to ITT belie these later assertions. This evidence leaves us with the overwhelming impression that no reasonable jury could conclude that the three Tidwell homes were not on the floor plan.
 
 
 14
 Second, Coker's asserts that ITT breached the contract by failing to give written notice that a unit had been placed on Coker's floor plan. Paragraph 2 of the Agreement states that "[w]hen you [ITT] advance funds you may send us a Statement of Transaction or other statement if you choose." It is irrelevant whether ITT sent a Statement of Transaction or not, because the Agreement's use of the word "may," as opposed to "shall," clearly renders such notice optional. Coker's contention that the use of the word "may" is meant only to show the choice available to ITT between "a Statement of Transaction or other statement" violates common sense because such construction would make "if you choose" redundant. Thus, ITT's failure to send this statement, if true, is, as a matter of law, not a breach of the agreement.
 
 
 15
 Third, Coker's asserts that ITT's refusal to remove the units, despite Coker's objections that the units were not part of the floor plan, was a breach. However, Coker's fails to show which contract provision was breached by this failure to remove. ITT did offer to remove the homes, but Coker's refused until it was compensated for the costs of storing the homes for a long period of time. During most of such time, storage could not have been properly charged to it.
 
 B. Fraudulent Intent
 
 16
 The linchpin of this cause of action is fraud, which, as the South Carolina Supreme Court has noted, is a concept not easily reduced to a few, concise principles:
 
 
 17
 [Fraud] assumes so many hues and forms, that courts are compelled to content themselves with comparatively few general rules for its discovery and defeat, and allow the facts and circumstances peculiar to each case to bear heavily upon the conscience and judgment of the court or jury in determining its presence or absence.
 
 
 18
 Harper v. Ethridge, 290 S.C. 112, 119, 348 S.E.2d 374, 378 (Ct.App.1986) (citing Sullivan v. Calhoun, 117 S.C. 137, 139, 108 S.E. 189, 189 (1921)). Consequently, the South Carolina courts have found a wide variety of factual allegations sufficient to give rise to a claim for fraudulent breach of contract. See Edens v. Goodyear Tire & Rubber Co., 858 F.2d 198, 201-02 (4th Cir.1988). Nevertheless, the South Carolina courts have provided the parameters of fraud as it pertains to the present cause of action, which we analyze and apply below.
 
 
 19
 The second element requires a fraudulent intent relating to the breaching, not merely to the making of the contract. Since direct evidence of fraudulent intent is rare, it is usually shown by circumstances surrounding the breach, often from the alleged fraudulent acts themselves. Scott v. Mid Carolina Homes, Inc., 293 S.C. 191, 197, 359 S.E.2d 291, 295 (Ct.App.1987). Unlike the ordinary breach of contract case, the existence of motive is highly relevant in showing intent. Edens, 858 F.2d at 203.
 
 
 20
 Coker's asserts that a jury could have found that ITT possessed the fraudulent intent to hold Coker's responsible for a debt for which ITT supposedly knew Coker's was not responsible. Coker's attempts to compare ITT's actions to the "typical factual scenario" for this cause of action by showing that ITT had something to gain--some "ultimate goal" in mind--by breaching its contract with Coker's. Giving no direct evidence of fraudulent intent, Coker's instead recites the three ways that ITT apparently breached the contract with Coker's. In particular, Coker's emphasizes that ITT knew from Coker's complaints that Coker's was not responsible for the three Tidwell homes. Coker's refers to several letters between ITT and Tidwell, in which ITT supposedly accepted Coker's lack of responsibility.
 
 
 21
 Coker's contentions fail for several reasons. First, Coker's infers ITT's fraudulent intent primarily from the fact of ITT's alleged breaches of the contract. This is clearly insufficient to take this case out of the realm of a basic breach of contract action, as discussed below regarding the third element. See Smith, 275 S.C. at 260, 269 S.E.2d at 350; Patterson v. Capital Life & Health Ins. Co., 228 S.C. 297, 299, 89 S.E.2d 723, 724 (1955). Second, Coker's wrongly concludes from the evidence that ITT conceded, and thereby knew, that Coker's was not responsible for the Tidwell homes. ITT made no concession but simply recognized that Coker's disputed ITT's understanding of the status of the homes. Finally, Coker's characterization of ITT's fraudulent motive as an effort to defraud Coker's out of $8,100, notwithstanding the parties' otherwise congenial and mutually profitable relationship, stretches the bounds of imagination and is not supported by the record. Therefore, since this evidence does not allow a reasonable inference of fraudulent intent on the part of ITT, the district court erred in permitting the issue to go to the jury.
 
 C. Fraudulent Acts
 
 22
 The third element requires a fraudulent act that accompanies the breach and is "done with the intent to deceive." Save Charleston Foundation v. Murray, 286 S.C. 170, 181, 333 S.E.2d 60, 67 (Ct.App.1985). While the fraudulent act "may be prior to, contemporaneous with, or subsequent to the breach of contract," it "must be connected with the breach itself and cannot be too remote in either time or character." Floyd, 287 S.C. at 54, 336 S.E.2d at 504.
 
 
 23
 To prove a fraudulent act for purposes of this cause of action, a plaintiff need not prove the elements of common law fraud. Harper, 290 S.C. at 119, 348 S.E.2d at 378. Instead, a fraudulent act is simply "any act characterized by dishonesty in fact, unfair dealing, or the unlawful appropriation of another's property by design." Id. For example, a fraudulent act exists where a party accepts payment notwithstanding knowledge of its own breach. See Glover v. North Carolina Mut. Life Ins. Co., 295 S.C. 251, 368 S.E.2d 68 (Ct.App.1988) (fraudulent collection of premiums by insurance company after it repudiated the contract); Floyd, 287 S.C. at 55, 336 S.E.2d at 504 (fraudulent acceptance of down payment by mobile home retailer knowing that he had breached by not getting the agreed upon financing). However, the mere refusal or failure to pay a debt is insufficient. Patterson, 228 S.C. at 299, 89 S.E.2d at 724. A fraudulent act also results from misrepresentations, such as those made to induce a party to enter into a contract, see Floyd, 287 S.C. at 54-55, 336 S.E.2d at 504, or to deter a party from suing for breach of contract. See Scott, 293 S.C. at 198, 359 S.E.2d at 295. But when the fraudulent act is a misrepresentation, the plaintiff must prove reliance on the misrepresentation. Rutledge v. St. Paul Fire & Marine Ins. Co., 286 S.C. 360, 365, 334 S.E.2d 131, 135 (Ct.App.1985).
 
 
 24
 To satisfy this requirement, Coker's offers five fraudulent acts: (1) ITT's failure to notify Coker's of its lack of liability for the debt when ITT knew of that fact; (2) ITT's repeated and threatening demands for payment when ITT knew Coker's was not responsible for the debt; (3) ITT's adverse credit reports given out to Meritor and other financial institutions; (4) ITT's attempt to charge Coker's a default rate of interest for a debt for which ITT knew Coker's was not responsible; (5) ITT's attempt to pad its files with "corrected" Statements of Transaction asserting that Coker's had bought the Tidwell homes.
 
 
 25
 We find Coker's allegations of fraudulent acts insufficient for several reasons.[2] First, these acts do not constitute fraud on the part of ITT because there is no evidence that ITT knew and accepted Coker's interpretation of the contract's terms and nevertheless sought dishonestly to obtain payment. On the contrary, the evidence shows only that ITT was simply trying to get paid according to its understanding, albeit disputed, of the contract. This is clearly insufficient under Smith, where, in analyzing the scope of an insurance contract, the South Carolina Supreme Court found that allegations which "merely affirm appellant's position on coverage ... are not fraudulent in and of themselves." Smith, 275 S.C. at 260, 269 S.E.2d at 350.
 
 
 26
 Second, these allegations, even if indicative of fraud, fail because they simply repeat the rudimentary aspects of Coker's breach of contract claim and do not provide any fraudulent acts that accompanied the breach. Id., 275 S.C. at 260, 269 S.E.2d at 350 (where court found insufficient allegations that "merely restate[d] the manner in which the [insurer] is alleged to have breached the oral agreement," even though the allegations imputed a fraudulent motive on the part of the insurer). See also Hardee v. Penn Mut. Life Ins. Co. of Philadelphia, 215 S.C. 1, 11, 53 S.E.2d 861, 865 (1949) ("Even in the wilful and fraudulent breach of a contract only actual damages may be recovered, unless the fraudulent breach is accompanied by a fraudulent act.").
 
 
 27
 Third and finally, Coker's provides no evidence that it actually relied to its detriment on the fraudulent acts allegedly perpetrated by ITT. On the contrary, Coker's concedes that it believed all along that it was not responsible for the debt and thus could not have changed its position because of any of ITT's acts. Moreover, ITT did nothing that prevented Coker's from seeking to recover any actual damages to which the alleged breach of contract might have entitled Coker's. Vann v. Nationwide Ins. Co., 257 S.C. 217, 221, 185 S.E.2d 363, 365 (1971); Rutledge, 286 S.C. at 365, 334 S.E.2d at 135. Coker's characterization of two of these acts--ITT's failure to disclose that it knew Coker's was not responsible for the debt and ITT's attempt to pad its file with "corrected" Statements of Transactions--as concealments and thus exempt from the reliance requirement under Edens is unavailing, because even if Edens relieves Coker's of the "burden of producing direct evidence of reliance," it does not preclude the relevance of an admitted lack of reliance. Edens, 858 F.2d at 206-07.
 
 III
 
 28
 ITT argues that the district court abused its discretion in denying ITT's motion for Rule 11 sanctions. Some recitation of the facts is necessary. Coker's original complaint filed on May 13, 1986, named, in addition to ITT, Tommy G. Dodson ("Dodson") as defendant and alleged that Dodson was "a citizen and resident of the State of South Carolina, County unknown." Around June 16, 1986, ITT removed the action to the United States District Court for the District of South Carolina, stating in its petition that
 
 
 29
 the defendant Tommy G. Dodson is not, on information and belief, a resident of the State of South Carolina; that even the Plaintiff is unaware of said Defendant Dodson's specific residence; that as of the time of this Petition Defendant Dodson has not been served and that this Defendant [ITT] is informed and believes that Plaintiff has alleged Defendant Dodson's residence to be within the State of South Carolina solely for the purpose of attempting to defeat this Defendant's right of access to this Court by virtue of diversity of citizenship.
 
 
 30
 After the case proceeded in discovery for more than a year with no indication that Dodson was a South Carolina resident, Coker's, just prior to the scheduled date for trial, filed on July 2, 1987, a motion for remand, signed by Coker's attorney, John E. Miles, claiming lack of diversity; the motion was supported by an affidavit dated June 23, 1987, which stated that:
 
 
 31
 I Tommy Dodson do hereby state that I am a resident of South Carolina. I have always considered South Carolina my home, although I have lived in other states for periods of time. I have always voted in South Carolina, and have not voted in the other states which I lived in. I was born in South Carolina, raised in South Carolina, and attended South Carolina schools. My address is 136 Scwartz Rd., Lexington, South Carolina.
 
 
 32
 Dodson's deposition on July 6, 1987, however, revealed many inaccuracies in this affidavit. Dodson was not born in South Carolina, was not raised in South Carolina, never voted in South Carolina and did not attend any South Carolina schools. From 1981 through the end of 1986, after the filing of this suit, Dodson was not physically present in South Carolina, except for a brief period of three to four months. Instead, he held a number of jobs in North Carolina, Georgia and Alabama. Coker's attorneys continued to pursue the remand motion even after Dodson's deposition made manifest the errors of fact contained in the affidavit.
 
 
 33
 The district court heard arguments on ITT's motion for Rule 11 sanctions at a hearing on July 10, 1987, and denied the motion on July 17, 1989. Since the court did not make specific findings of fact and conclusions of law, but instead simply stamped "Denied" on ITT's motion itself, we are unable to properly review its decision. Kreager v. Solomon & Flanagan, P.A., 775 F.2d 1541, 1543 (11th Cir.1985); Tarkowski v. Lake County, 775 F.2d 173, 176 (7th Cir.1985). However, we note that it appears that ITT established a prima facie entitlement to sanctions and that the district court should explain its refusal to grant the motion. Tarkowski, 775 F.2d at 176. For this reason, we remand the issue of sanctions so that the district court can make reviewable findings.[3]
 
 IV
 
 34
 For the above reasons, we reverse the district court's denial of JNOV and remand the issue of Rule 11 sanctions for further proceedings consistent with this opinion.
 
 REVERSED AND REMANDED
 
 
 [1]
 However, we note that a claim for breach of contract accompanied by a fraudulent act is not separate from one for breach of contract. Smith v. Canal Ins. Co., 275 S.C. 256, 260, 269 S.E.2d 348, 350 (1980). Rather, proof that a breach of contract was accompanied by a fraudulent act allows recovery of punitive damages. Id. Thus, Coker's may defend its actual damages award by showing a breach of contract, but lose its punitive damages award by failing to show the requisite fraudulent intent and act. See also Plowden v. Atlantic States Constr. Co., 264 S.C. 139, 141, 213 S.E.2d 100, 101 (1975) (where court noted in dicta that the lower court should have summarily overruled a demurrer to a complaint on the grounds that the allegations were insufficient to show fraudulent acts, because the demurrer did not "challenge the sufficiency of the facts alleged to entitle plaintiffs to recover actual damages.")
 
 
 [2]
 ITT argues that Coker's did not allege these fraudulent acts in its complaint, which asserts only that ITT "arrang[ed] without authority and contra to the provisions of the contract, for funds to be expended by the defendant [ITT] on behalf of [Coker's] all to its detriment in order to fraudulently, intentionally and willfully gain a financial advantage to the detriment of [Coker's]." While it is uncertain that this allegation satisfies Rule 9(b) of the Federal Rules of Civil Procedure, which requires that "[i]n all averments of fraud ... the circumstances of fraud shall be stated with particularity," ITT failed to object to the sufficiency of the pleading and so gave its implied consent. Matter of Prescott, 805 F.2d 719, 724-25 (7th Cir.1986). See also 2A J. Moore & J. Lucas, Moore's Federal Practice, p 9.03, at 9-60 to 61 (2d ed. 1989)
 
 
 [3]
 We expressly do not decide whether the district court must give specific findings of fact and conclusions of law every time a party seeks sanctions under Rule 11, which other circuits have declined to do. See Thomas v. Capital Sec. Services, Inc., 836 F.2d 866, 882-83 (5th Cir.1988) (adequate explanation by the trial court required "when the basis and justification for a Rule 11 decision is not readily discernible on the record"); Szabo Food Service, Inc. v. Canteen Corp., 823 F.2d 1073, 1084 (7th Cir.1987) (findings not required where "the reason for the decision is obvious"). However, on the present facts, such findings and conclusion are required